(No. 54170.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DENNIS EMERSON, Appellant.

*Opinion filed October 4, 1983.*

488

Theodore A. Gottfried, State Appellate Defender, and Robert E. Davison, First Assistant Appellate Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Tyrone C. Fahner, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Michael B. Weinstein, Assistant Attorney General, and Michael E. Shabat, Joan S. Cherry, and Faith S. Salsburg, Assistant State's Attorneys, all of Chicago, of counsel), for the People.

JUSTICE GOLDENHERSH delivered the opinion of the court:

In a jury trial in the circuit court of Cook County defendant, Dennis Emerson, was convicted of the murder of Delinda Byrd. Pursuant to section 9—1(d) of the

Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(d)) the People requested a sentencing hearing. The jury found that one or more of the aggravating factors set forth in section 9—1(b) existed, in that the murder occurred during the commission of an armed robbery, defendant was over 18 years of age when he committed the crime, and there were no mitigating factors sufficient to preclude a sentence of death (see Ill. Rev. Stat. 1979, ch. 38, par. 9—1(d)). The jury returned a verdict directing the court to sentence defendant to death, defendant was so sentenced, and the sentence was stayed (73 Ill. 2d R. 609(a)) pending direct appeal to this court. Ill. Const. 1970, art. VI, sec. 4(b); 73 Ill. 2d R. 603.

In addition to the conviction for murder, defendant was convicted of attempted murder, armed robbery and aggravated arson. His brother and codefendant, Richard Jackson, was convicted of murder, attempted murder and armed robbery, but acquitted of aggravated arson. The codefendant was not sentenced to death and is not a party to this appeal.

Robert Ray testified that he owned and operated the Centaur Lounge. He lived in the apartment in the rear of the lounge. Ray stated that at approximately noon on August 12, 1979, defendant called him on the telephone. In the conversation, defendant said that he had to do some things and that he would come by later on in the day. Defendant called two or three more times that day with essentially the same message. Ray recognized defendant's voice because he had known him for about four years and had previously spoken with him on the telephone. Ray also knew Ricky Jackson, a brother of defendant and Richard Jackson. Ricky had worked for Ray at the lounge, helping keep the lounge clean, "spinning records," and doing other chores. Ray stated that he knew of Richard Jackson, the codefendant, and had

seen him before, but did not know him personally.

Ray closed the lounge at about 2 a.m. As Ray was cleaning up, defendant and Richard Jackson arrived at the tavern and rang the doorbell. Ray let them in and they went to the kitchen in Ray's apartment. As they were talking, Delinda Byrd, Ray's girlfriend, arrived. Ray introduced her to defendant and Richard and the four of them continued the conversation. A short time later, defendant stood up, drew a gun, and told Ray and Delinda to lie on the floor. Defendant then left the room and returned with some electrical cord. Defendant tied their hands behind their backs and also tied their feet. Defendant took Ray's keys, opened the cash register, and removed all the money that it contained. Defendant took some guns which Ray had on the premises, and also took between $500 and $600 from Delinda. Richard found a "half pair of shears" (apparently half of a broken pair of barber's scissors) and gave it to defendant and told him to "use this." Defendant straddled Ray, raised him up by his right shoulder, and stabbed him twice in the right side of the chest. He went over to Delinda. Ray asked defendant to stop, but defendant just looked at Ray "real cold" and repeatedly stabbed Delinda. Defendant went into Ray's bedroom. Ray smelled smoke and saw flames coming from his bed. Defendant attempted to pick up Ray to put him in the burning room, and, apparently because Ray was too heavy, asked Richard to help him. Together, they put Ray in the bedroom. They also put Delinda into the bedroom. The door was closed behind them, and wired shut with a wire coat hanger.

After Ray determined that defendant and Richard had left, he was able to untie his hands. He hopped over to a window, raised it, leaned forward, and fell out the window into an air shaft between the building in which the apartment was located and an adjoining building.

Ray estimated that he fell approximately six or eight feet. Delinda also managed to reach the window and fell on top of Ray. Ray untied his feet and then helped Delinda untie herself. Because of the height of the walls he was unable to escape from either side of the air shaft. Ray jumped up, grabbed the window ledge, and pulled himself back up into the burning room. He tried the door but was unable to open it. He climbed back into the air shaft.

Delinda and Ray screamed for help but were unable to attract anyone's attention. Ray recalled that there was a window which opened into the lounge. In this window there was an air conditioner surrounded by plasterboard. Ray climbed up to the window, kicked in the plasterboard, and pushed the air conditioner into the lounge. He fell into the lounge, which was full of smoke and very hot, and ran out the front door. Outside, he saw a small boy who lived upstairs and told him to tell his parents to call the fire department. Ray then ran to the back of the building to talk to Delinda. There was a small slit between the buildings through which one could see into the air shaft. Delinda told Ray that it was getting hard to breathe in the air shaft and that it was getting hot. Ray then ran back to the front of the building and tried to enter the basement through a door in the men's washroom. The door was locked and defendant and Richard had taken the keys. The firemen arrived, and Ray told them where Delinda was trapped. Ray lay down on the sidewalk and while lying there was approached by uniformed policemen. He spoke to them briefly and then was taken to the hospital in an ambulance.

At the hospital, the police showed Ray a group of approximately eight photographs. From these he selected the pictures of Richard Jackson and defendant. Ricky Jackson's picture was also included in this group of

photos.

On cross-examination Ray denied ever owing defendant any money. He explained that the reason that Delinda was carrying so much money that night was that she was looking for an apartment. Defense counsel asked Ray whether he told the first officers he saw, or any other policemen, that when he answered the bell he was met by two brothers who drew guns at that time. Ray denied ever telling anyone this. Ray admitted telling police that after defendant and his brother entered the building he left for a short while to purchase cigarettes. On redirect examination it was brought out that Ray immediately told the police officers that it was defendant and his brother, Richard Jackson, that had perpetrated the crime.

Edward Barry, a fireman, testified that his truck arrived at the fire simultaneously with other units. As they arrived he saw what appeared to be a victim of the fire "screaming and yelling." This man (Ray) was covered with blood and hysterical. The man directed the firemen to the rear of the building where he said a woman was trapped. When Barry saw Delinda through the slit in the wall, she attempted to reach him. Mr. Barry described the unsuccessful efforts to save Delinda and the removal of her body from the air shaft. He described the condition of the building after the fire.

Officer Griffin, a Chicago policeman, testified that when he first saw Ray, he was "bloody from the chest area" and his clothes were disheveled. After talking with Ray he and his partner went immediately to the Jackson brothers' home but did not find either defendant or Richard Jackson at home. They found no evidence of items taken from the tavern. Officer Griffin and his partner returned to Ray's tavern. Officer Griffin found a door-lock assembly which had a coat hanger attached to it and some electrical cord. On cross-examination, Officer Grif-

fin stated that no fingerprints were found at the tavern. Officer Griffin said that Ray had told him that $400 to $600 had been taken by his assailants. On redirect examination, Officer Griffin stated that Ray identified defendant and Richard Jackson as his assailants immediately when he arrived at the burning tavern.

Dr. Stein, the Cook County coroner, testified that Delinda Byrd's corpse had five stab wounds in the back which perforated both the right and left lungs. He stated that since there was smoke in the trachea, she was probably still alive for some time while the building was burning.

Ricky Jackson, the brother of defendant and Richard Jackson, testified that he had worked for Robert Ray. He stated that his duties included delivering marijuana for Ray. Ricky said that defendant had loaned Ray $5,000 sometime in April, May or June of 1975. On cross-examination, Ricky testified that he was not aware that defendant was incarcerated from March 1975 until sometime in 1979.

Defendant testified in his own behalf. On direct examination, defendant admitted to pleading guilty to three counts of armed robbery on August 29, 1971, and one count of armed robbery on August 30, 1971. Defendant also admitted that, shortly after being released from prison on parole in March 1975, he was charged with and pleaded guilty to the Federal offense of receiving stolen bank property. At approximately the same time defendant also pleaded guilty to another armed-robbery charge. The sentences for these offenses ran concurrently. Defendant was released from prison approximately three weeks before the crimes involved here were committed. Defendant testified that he pleaded guilty to all these crimes because he was guilty, but that he was not guilty of the crimes charged in this case. Defendant stated that he had known Ray for some time and had

purchased marijuana from him. He said that he had loaned Ray some of the money that he had received which had been stolen from the bank. Defendant stated that Ray had informed him that he had been robbed earlier, that he wanted to get back into the business of selling drugs, and that it was for that purpose that he needed the loan. Defendant testified that while he was in jail he had made many attempts, through the mail and by telephone, to recover the money from Ray but that Ray had not repaid the money. Defendant also stated that he sent his sister and his brother to ask Ray to repay the loan. Defendant testified that on the night of the occurrence involved here he was at home until approximately 4 a.m., and then went to his ex-wife's house for the rest of the night. He said that he did not return home after that because he knew the police were looking for him.

Defendant contends that several comments made by the assistant State's Attorneys during final argument were so prejudicial that the judgment must be reversed. The first instance involved the circumstances surrounding defendant's arrest. Defendant was not arrested until February 11, 1980, approximately six months after the crimes were committed.

Before trial, counsel for defendant moved *in limine* to preclude the People from mentioning that when defendant was arrested he was in possession of a loaded revolver. At trial, one of the arresting officers testified that when defendant was apprehended he did not resist arrest and went peaceably to the police station with the officers. In closing argument, defense counsel argued to the jury that when defendant was arrested he did not act like a guilty person and that he offered no resistance. In response, the assistant State's Attorney said:

"Well, ladies and gentlemen, we can't tell you everything he did after his arrest and he knows it. Maybe when this is over I will tell you what he did when he was arrested."

The circuit court sustained defendant's objection to this statement.

This remark was clearly improper. It is error to comment on facts which are inadmissible (*People v. Donaldson* (1956), 8 Ill. 2d 510, 518), or to suggest that evidence of guilt existed which, because of defendant's objection, cannot be brought before the jury. (See *People v. Lopez* (1980), 89 Ill. App. 3d 456, 457; *People v. Martinez* (1979), 76 Ill. App. 3d 280, 285.) Defendant argues, and we agree, that the inference that defendant had been guilty of improper conduct at the time of the arrest left the jury free to speculate as to the nature of that misconduct. This court has recognized that an insinuation which leaves the jury to speculate may be more prejudicial than erroneously admitted specific proof. *People v. Dukes* (1957), 12 Ill. 2d 334, 342.

Defendant argues that statements made by the assistant State's Attorney suggested that the defense attorneys created the defenses themselves and had suborned perjury. In final argument one of the assistant State's Attorneys stated to the jury that defense counsel had laid down a smokescreen "composed of lies and misrepresentations and innuendoes." He stated that all defense attorneys try to "dirty up the victim" to distract the attention of the jury from the defendant's crime. Unless based on some evidence, statements made in closing arguments by the prosecution which suggest that defense counsel fabricated a defense theory, attempted to free his client through trickery or deception, or suborned perjury are improper. (*People v. Weathers* (1975), 62 Ill. 2d 114, 117-21; *People v. Stock* (1974), 56 Ill. 2d 461, 472; *People v. Freedman* (1954), 4 Ill. 2d 414, 422.) It is not clear whether the assistant State's Attorney was suggesting that the defense attorneys were guilty of lying or misrepresenting facts or whether he was suggesting that the defense presented consisted of testimony which was composed of lies and misrepresentations.

It is clear, however, that statements to the effect that all defense attorneys try to "dirty up the victim" and that the defense attorneys want to walk the defendants out of court and put them back on the street improperly shift the focus of attention from the evidence in the case to the objectives of trial counsel. Furthermore, a comment concerning the trial tactics of "all" defense attorneys cannot be said to be based on the evidence and does little to help the jury resolve the issues in the case.

Defendant points to other statements made in argument which he contends constituted reversible error. The assistant State's Attorney stated that, if they could, the defense attorneys would deny that any death occurred, but since they could not realistically do that, they had to "make something up." Thus, the assistant State's Attorney continued, they came up with a reason why Robert Ray would come into court and lie, "so they put on evidence that Robert Ray owed defendant money." The assistant State's Attorney concluded that this could not be a reason to falsely accuse the defendants of this crime since it was illogical that Robert Ray would want to let the real killers go just to avoid the debt he allegedly owed to defendant.

The People contend that the comment concerning the circumstances of defendant's arrest was justified as a response to defendant's argument. The officer who arrested defendant testified in the sentencing hearing, and it appears from his testimony that defendant was arrested because he appeared to be nervously and suspiciously watching a place of business late at night. Upon his being taken into custody it was found that he had a loaded revolver in his possession. The order *in limine* prohibited any mention at trial of the reason for the arrest or the fact that he was armed at the time. We do not agree that by inquiring whether it was not a fact that defendant, upon being arrested, accompanied the officers peacefully, the defendant "opened the door" to the comment made by the assistant

State's Attorney.

Citing *People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, the People assert that the argument concerning the fabricated defense and the conduct of defense counsel was not prejudicial error. In *Weatherspoon*, the State's Attorney's reference to counsel was that they were attempting to confuse the jury, that the argument was a "smoke screen" and a "snow job." (63 Ill. App. 3d 315, 324.) We find that argument clearly distinguishable from the argument here which, in effect, purports to charge counsel with fabrication of a defense bordering on subornation of perjury.

Defendant argues that the circuit court erred in admitting evidence that Robert Ray had made a prior consistent statement. Over defendant's objection, the People were permitted to ask Officer Griffin whether, when Griffin encountered Robert Ray sitting on the curb shortly after Ray had escaped the burning building, Ray identified the perpetrators of the crime. Also over objection, Ray was permitted to testify that he told the first police officers who arrived on the scene that defendant and his brother had committed these crimes. Citing *People v. Clark* (1972), 52 Ill. 2d 374, defendant argues that allowing these prior consistent statements was erroneous because the motive to testify falsely (Robert Ray's alleged $5,000 debt owed to defendant) existed before he made the statements consistent with Ray's testimony in court.

The People argue that defense counsel "opened the door" by attempting to impeach Ray's testimony with prior inconsistent statements and otherwise impeach his credibility. Counsel for Richard Jackson asked Ray whether he had told Daniel McWeeny, an investigator for the Chicago police department, that only defendant, and not Richard Jackson, had placed Ray and Delinda Byrd in the burning bedroom and locked the door. Counsel for defendant asked Ray whether he told Officer McWeeny that when

he first answered the door the assailants had their guns drawn and whether he had told the investigators that after defendant and Richard Jackson had arrived he left the tavern to purchase cigarettes. Counsel for Richard Jackson asked Ray whether it was Ricky Jackson who was at the tavern that night, to which Ray replied that it was not.

The People argue that Ray's prior statement was properly admitted because Richard Jackson's attorney had attempted to elicit from Ray the statement that Dennis Emerson alone had been responsible for placing him and Delinda Byrd in the burning bedroom. They argue that the People were properly permitted "to underscore" Ray's identification of defendant and Richard Jackson as the men who entered his tavern and committed the robbery and murder. We do not agree. The cross-examination was not directed to the identity of the assailants; it was designed to show that one of them had not participated in certain conduct. The only prior consistent statement relevant under the circumstances would be one concerning the actions of the two perpetrators, and it did not open the door to a gratuitous corroboration of Ray's testimony concerning the identity of his attackers.

The People recognize the general rule that prior consistent statements may be used only to rebut an inference of recent fabrication (see *People v. Clark* (1972), 52 Ill. 2d 374, 389) but argue that prior consistent statements are admissible where opposing counsel has introduced part of a statement which is inconsistent and the remainder of the statement would qualify or explain the inconsistency (*People v. Richmond* (1980), 84 Ill. App. 3d 1017, 1021-22), or where it is questionable whether the prior inconsistent statement was made, and introduction of the prior consistent statements tends to prove that the inconsistent statements were not made (*People v. Rodriguez* (1978), 58 Ill. App. 3d 562, 569). Thus, the People argue that defense counsel's introduction of part of Ray's statement to the po-

lice, and their suggestion that Ray told police the assailants arrived at the tavern with guns drawn, opened the door to the introduction of Ray's statement to the police identifying defendant and Richard Jackson as the offenders.

Our cases have consistently held that evidence of statements made prior to trial for the purpose of corroborating testimony at trial is inadmissible. The rule is well stated in *Lyon v. Oliver* (1925), 316 Ill. 292, 303:

> "As a general rule, proof of statements made by a witness out of court harmonizing with his theory is inadmissible, but where it is. charged that his story is a recent fabrication or that he had some motive for testifying falsely, proof that he gave a similar account of the transaction when the motive did not exist or before the effect of the account could be foreseen is admissible."

(See also *People v. Clark* (1972), 52 Ill. 2d 374; *People v. Wesley* (1959), 18 Ill. 2d 138.) Obviously the motive for testifying falsely existed prior to the time when the statements attributed to Ray were made, and they should not have been admitted.

The People argue that the testimony of Officer Griffin concerning Ray's statement was admissible as a spontaneous declaration. This theory of its admissibility was advanced for the first time in this court, which may explain why the record fails to contain proof of the essential element that when it was made there had been no time since the occurrence for reflection and invention. *People v. Poland* (1961), 22 Ill. 2d 175.

On at least four occasions in final argument the assistant State's Attorney made reference to the prior consistent statement of which defendant complains. This was clearly improper and erroneously emphasized the corroborative effect of the statement which should not have been admitted.

The evidence of guilt consists solely of Ray's testimony. Defendant made no inculpatory statements, as previously noted, no fingerprints were found, and there was no evi-

dence that any of the proceeds of the robbery were in defendant's possession. Defendant denied any participation in the offense, and his testimony, if believed, would supply the motive for Ray's having charged him with the offense.

Where guilt or innocence depends entirely on the credibility of an accuser and the defendant, no error should be permitted to intervene. "Where error is shown to exist, it will compel reversal, unless the record affirmatively shows that the error was not prejudicial." (*Duffy v. Cortesi* (1954), 2 Ill. 2d 511, 517.) Here, the record fails to show affirmatively that the improperly admitted testimony and the improper oral argument were not prejudicial. The judgment must therefore be reversed and the cause remanded to the circuit court of Cook County for a new trial.

The parties have briefed and argued a number of other questions, many of which have been decided in recent opinions in cases in which the death penalty had been imposed. Other matters of which defendant complains are not likely to recur upon retrial and need not be further considered. For the reasons stated the judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*