THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
STANLEY K. LAWLER, Defendant-Appellant.

Fifth District   No. 5—88—0139

Opinion filed February 28, 1990.

Daniel M. Kirwan and Larry R. Wells, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Paul Hillis, State's Attorney, of Salem (Kenneth R. Boyle, Stephen E. Norris, and Matthew E. Franklin, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GOLDENHERSH delivered the opinion of the court:

After a jury trial, defendant, Stanley K. Lawler, was found guilty of aggravated criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—13(a)(1)) and was sentenced to 12 years in the Department of Corrections. In this cause defendant raises the following issues: (1) whether defendant was denied a fair trial because the jury was allowed to hear the content of a telephone conversation between the complaining witness and her father in which she alleged that she was being abducted by an armed man, and (2) whether defendant was denied a fair trial because the trial court allowed the jury to consider defendant's 1979 robbery and aggravated battery convictions. We reverse and remand.

The complaining witness, age 21, was the first witness to testify. She told the jury that on the evening of July 17, 1987, her son went to visit his father, the victim's first husband. The victim lived in Shattuc with her second husband, and her ex-husband lived in Mt. Vernon. According to the victim, this was only the second time her son had an overnight visitation with his father. She was concerned and called her ex-husband several times to check on her son. Her telephone calls were not answered. The victim called her father and asked him to accompany her to Mt. Vernon to check on her son, but her father declined to go along with her. She then went by herself to Mt. Vernon. The victim stated she arrived in Mt. Vernon at approximately 12 a.m. on July 18, and went to her ex-husband's house, but no one answered the door. She also made several phone calls to her ex-husband's house from a convenience store in Mt. Vernon. She was not able to reach her husband. Between 3:30 and 4 a.m., she decided to drive back to Shattuc.

On her way back, she stated, a car pulled into the left lane as if to pass her. The driver of this car was defendant. When defendant was alongside the victim's vehicle, he rolled down his window and told her that her driver's side rear tire was wobbling and about to come off.

The victim had hit a pothole earlier in the evening and was concerned that this had caused some damage. The victim pulled into a nearby empty parking lot in order to check her tire. Defendant pulled in behind her, parked his car, and walked toward her car. Defendant told her that her left wheel was about to fall off. The victim opened her door and checked the tire, but could see nothing wrong with it. Defendant told her it was the other tire, so the victim got out of her car, and she and defendant examined the rear wheels. The victim saw nothing unusual, so she went back inside her car. Before she could shut her door, defendant drew a pistol from his waistband and told the victim to move to the passenger side of the car. Defendant then got into the car with her and drove back toward the interstate. Defendant had the gun on the driver's seat between his legs. The victim then attempted to deceive defendant by telling him that her ex-husband had stolen her child, that a search party was looking for her son, and that she needed to call her father to let him know where she was or the search party would begin looking for her as well. Defendant drove the victim's car to a pay telephone at a Hen House Restaurant located off the interstate and allowed the victim to make a phone call. She testified that she called her father collect while defendant was standing behind her. The victim stated that she wanted to let her father know something was wrong and that she was in trouble, so she told her father that her ex-husband had taken her son and that her father should get the "police out looking." In order to alert him that something was amiss, she asked if Liz and Dave were there. Liz and Dave were fictitious names she used to make her father suspicious. He did become suspicious and then asked her a series of questions about who she was with, to which the victim generally answered "Yes" or "No." Her father learned that she was with an armed "weirdo" and that she was between Centralia and Mt. Vernon and could not get away. Her father suggested that she should try to get defendant to take her to Hardee's Restaurant in Mt. Vernon. Her father stated that he would have the police there waiting for her.

After the victim got off the telephone, she and defendant returned to her car and drove to an isolated location. Defendant then exited the vehicle and walked to the front of it. The victim was unsure where the pistol was at this time and hoped that defendant had left it in the car. She then moved to the driver's seat and attempted to start the car. Before the victim could drive away, defendant put the gun to her head and stated, "You fucked up now, bitch." Defendant then reached in and took the keys out of the ignition and pulled the victim into the back seat and forced her to disrobe. According to the

victim, defendant then penetrated her vagina with his penis. The victim informed defendant that she was not using birth control and asked defendant not to ejaculate in her. Defendant complied with her request and ejaculated in a towel the victim had in her car. Defendant told the victim she was very attractive and that it was a shame that he was going to have to kill her. Defendant also asked her if she had ever been raped before. The victim then put her clothes on and exited the vehicle in order to urinate.

When the victim got back in the car she told defendant she was sorry she had not been a better sexual partner, but that she was very hungry and promised defendant she would be better if she got something to eat. She then suggested that they drive to Hardee's in Mt. Vernon, but defendant said that Hardee's in Centralia was closer. On the way there, defendant stopped back by his car to roll up his windows. A large, black car followed them into the parking lot where defendant had left his car. The victim opened the passenger door and jumped from her door. She then noticed that the black car was her father's car. She ran back to her father's car and jumped into it, telling her father, "Shoot him, Dad. Shoot him." Defendant then drove off in her car. The victim pointed out defendant's car to her father, and her father drove back to defendant's car. Her mother then wrote down the license plate number.

The victim identified People's exhibit No. 1, a Taurus 9 millimeter automatic, as the gun that defendant used to abduct her. She testified that she did not consent to have sex with defendant, but did so only to save her life.

Lori Lawler, defendant's wife, testified that on July 17, 1987, defendant came home from work between 6:45 and 7 p.m. and told her that he had to leave again to go to Indianapolis as part of his job as a truck driver. Defendant ate dinner, took a shower, and then left again. Before defendant left his house he placed his gun, a Taurus 9 millimeter automatic, which had been on top of the refrigerator, in the Lawlers' bedroom closet. Mrs. Lawler did not see her husband take the gun out of the house on July 17. On the evening of July 17, Mrs. Lawler spent the night at her mother-in-law's home. She was afraid to spend the night alone because of a recent unsolved murder in the area. Mrs. Lawler went home on the morning of July 18 to get some clothes for her children. At her father-in-law's suggestion, she also retrieved the gun, which was still in the closet. The following Monday morning, Detective Leming of the Department of Criminal Investigation asked her for the gun and she gave it to him.

Detective Leming testified that he took the victim's car to Ronald

Durr, an auto body repair man. Mr. Durr testified as an expert that on July 18, 1987, he checked the victim's rear tires and found no wobble. Detective Leming also testified that he did not detect a wobble.

The victim's father testified that in the early morning hours of July 18, 1987, he received a telephone call from his daughter. He testified that the conversation was unusual and made him suspicious. He began asking his daughter a series of questions that could be answered with a "Yes" or "No" and found out that she was with an armed "weirdo" she did not know and that she could not get away. Through the conversation, he determined that she was somewhere between Centralia and Mt. Vernon. He then got a gun, and he and his wife picked up the victim's current husband. The trio then began searching for her. On the east side of Centralia, the father saw what he thought was the victim's car. He followed the car into a parking lot and then stopped his car, blocking the parking lot exit. He saw the victim jump from the passenger side of her car. The victim told him to shoot, so he fired a shot into the air. The victim got into his car and was hysterical. She was crying and shaking. As they drove away, the victim pointed out defendant's car. He had his wife write down the license plate number. He then took his daughter to the police station.

The mother related the same account as her husband. The victim's husband also described the same version of events.

Sandra Rutledge, a registered nurse at the hospital where the complaining witness was taken on the morning of July 18, 1987, testified that the victim was brought into the hospital at approximately 5:30 a.m. According to Rutledge, the victim was hysterical and crying, but had no physical injuries. Nurse Rutledge remained with the victim for approximately two hours. According to Rutledge, the victim was upset the entire time.

At 6:33 a.m. on July 18, 1987, State Trooper Thomas Olivero observed a car with the license plate number reported by the victim's father. The vehicle was spotted on Harmony Road in Mt. Vernon. After being stopped, defendant was taken to the police station and made a tape-recorded statement which was played to the jury. In the tape, defendant stated that he was driving in the Centralia area between 10 p.m. on July 17 and 4 a.m. on July 18. At approximately 4 a.m., he saw an automobile with a badly vibrating rear tire. He flashed his headlights and honked his horn in order to alert the driver of the car with the wobbling tire that the car had a problem. The car pulled over and he followed it. Defendant then got out of his car and walked up to the driver of the car, who was crying. Defendant told the driver

that her rear tire was wobbling. The driver got out of her car and both checked the tires, but found nothing wrong. The driver then told him that her name was Becky and that her ex-husband had her child. She asked defendant to help her find them by driving her car because she was too upset. Defendant agreed. He then drove her in the direction she indicated, and, at her request, stopped the car so that she could make a phone call. After the call, she told him she was lonely and cold. Defendant then gave her his jacket. She then embraced him and kissed him. After caressing each other for some time, Becky asked him to have sex with her. He drove to an isolated area where he parked the car and had sex. Becky told defendant she was not on the pill and asked him to ejaculate into a towel. Defendant complied with Becky's request. Defendant told the police that the towel was still in the car.

As the two were driving back to Centralia, defendant told her that he had to stop and roll up his windows. As they drove into the parking lot where defendant's car was parked, a large, black car followed them. The driver of this car jumped out with a pistol and fired it into the air. Defendant thought it was Becky's husband, so he stopped the car, and Becky got out. Defendant drove away. He later returned and picked up his own car and left Becky's car in the lot. Defendant then drove home. Defendant stated that he did not threaten her, nor was he carrying a gun.

At trial, defendant testified in his own behalf. His testimony was consistent with the recorded statement made after his arrest. He also testified that he did not pay attention to the content of the victim's telephone conversation with her father. He stated that he did not go to the police after shots were fired because he was afraid that his wife would find out about his sexual encounter. On cross-examination, defendant admitted that he told Detective Leming that the reason he went out on the evening of July 17, 1987, was to get some sex. He told Detective Leming that his wife had just had a baby and they had not been able to have sex for six weeks to two months.

David Winters, pastor of defendant's church, testified that defendant had a good reputation in the community for peacefulness and truthfulness.

Defendant's first issue on appeal is whether defendant was denied a fair trial because the jury was allowed to hear the content of a telephone conversation between the complaining witness and her father in which the complaining witness alleged she was being abducted by an armed man. Defendant contends that he was denied a fair trial because discussion of the conversation contained information that was

both hearsay and a prior consistent statement. Defendant further argues that the error was compounded by the prosecutor's closing argument, in which the prosecutor claimed that the conversation was substantive evidence. In reply, the State contends that the content of the call was admissible as an exception to the hearsay rule for three reasons: (1) the call reflected the victim's state of mind on a material issue, (2) the call was a spontaneous declaration, and (3) it was a prompt complaint of rape.

In the instant case, the jury heard testimony from the complaining witness that she convinced defendant to allow her to make a telephone call to her father by claiming her ex-husband had kidnaped her child and a search was being conducted. The complaining witness convinced defendant that if she did not call her father, he would become suspicious by her absence. During the telephone call, the complaining witness asked her father if Liz and Dave were still at home. Liz and Dave were fictitious names designed by the victim to make her father suspicious. The victim also told her father to get the "police out looking." Once her father became suspicious, he asked her a series of leading questions in order to find out her situation. By answering her father's questions with a "Yes" or "No," the victim informed her father (1) that she was "alone" with a "weirdo" who was "armed," (2) that she was "in trouble," (3) that she could not get away, and (4) that she was "sort of" in between Centralia and Mt. Vernon. The defense made a motion *in limine* to keep these statements out of evidence. The trial court denied defendant's motion *in limine*, finding that the statement was not hearsay since it was a device and not an assertion of the truth. In the alternative, the trial court held that it was a spontaneous utterance. The State, however, clearly chose the alternative ruling that this was a spontaneous utterance as evidenced by arguments made by the prosecutor during closing. Specifically, the prosecutor stated:

"Now, [the victim] testified that she was abducted by Stanley Lawler, that he showed a gun. She says he showed a gun. She called her father, told her father he was armed. You heard her father testify that she called, she was excited, she said in response to his questions, 'Are you with a weirdo?' 'Yes.' 'Is he armed?' 'Yes.' In the course of the very offense itself she managed to cry for help to her father and tell him that this man had a weapon, that he was armed and that she was with a weirdo. Obviously not consenting to this act if she's crying for help. Okay. There's abundant evidence that he had a weapon."

■ It is clear from this statement that the prosecutor was argu-

ing that the content of the conversation was factual. Therefore, the conversation was hearsay. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted and is generally inadmissible unless it falls within an exception to the hearsay rule. (*People v. Carpenter* (1963), 28 Ill. 2d 116, 190 N.E.2d 738.) The State urges that the victim's statement is an exception to the hearsay rule because it qualified as a spontaneous utterance. The trial court also ruled that these statements were spontaneous utterances.

The requirements for admissibility under the spontaneous declaration exception to the hearsay rule are: an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; absence of time to fabricate; and a statement relating to the circumstances of the occurrence. (*People v. Watts* (1985), 139 Ill. App. 3d 837, 850, 487 N.E.2d 1077, 1086; *People v. Damen* (1963), 28 Ill. 2d 464, 471, 193 N.E.2d 25, 29.) In deciding whether the declarant acted without thought, the court is required to consider all circumstances surrounding the making of the statement. (*Watts*, 139 Ill. App. 3d at 850, 487 N.E.2d at 1086.) In the instant case, the victim herself admitted that the conversation was a fabrication to put her father on notice that something was awry. The following excerpt of the victim's testimony in response to questioning by the assistant State's Attorney clearly indicates that her conversation was fabricated:

"Q. Were you able to reach your father?

A. Yes.

Q. And did you talk to your father?

A. Yes, I did.

Q. While you talked to your father, where was Mr. Lawler?

A. He was standing behind me at the phone, was at my left ear, and he was over here.

Q. When you reached your father, what happened on the phone?

A. Well, I wanted to get across to him that there was something wrong and that I was in trouble. So I started with the story that my ex-husband had taken my, you know, son and to get the police out looking.

Q. And how did your father respond to that?

A. He didn't know what I was talking about. He was—I still tried to get it across to him by saying, 'Is Liz and Dave there?'

Q. Who are Liz and Dave?

A. I have no idea. I just made those names up so he would get suspicious.

Q. How did he respond when you started telling him about

Liz and Dave?

A. He started to get concerned, because he doesn't know any Liz and Dave.

Q. Okay. When he got concerned, what did he say?

A. He asked me if I was alone, if I was in trouble.

Q. And what did you say?

A. 'Yes.'

Q. Did he ask you anything else?

A. He asked me if there was a weirdo with me, and I said 'Yes.'

Q. Did he ask you anything else?

A. If he was armed.

Q. And what did you say?

A. 'Yes.'

Q. What else took place in this conversation?

A. He asked me if I could, you know, get away, if he was in control.

Q. I'm sorry. I didn't hear that. Would you—

A. He asked me if I could get away, if, you know—and I said 'No.'

Q. How were you responding? Were you in a position where you could talk?

A. No. I was just answering yes or no.

Q. And after he asked if you could get away, did he say anything else?

A. He told me that he would get the police to go to Hardee's in Mt. Vernon. He tried to get out of me where I was at, but I could only answer yes or no. And he asked me if I was in Centralia, and I said 'No.' And then he asked me if I was in Mt. Vernon, and I said 'No.' And he asked me if I was somewhere in between, and I said, 'Sort of.' And then I tried to get across to him the Hen House by telling him to have Mom make me some chicken so when I get home—but he didn't catch onto that part.

Q. So what was he able to say about going to Mt. Vernon?

A. He told me to try to get to Mt. Vernon at their Hardee's and that he would call the police and have them there waiting.

Q. Was anything else said over the phone?

A. Not that I can recall right offhand."

We agree with defendant that this conversation between the victim and her father was not a spontaneous declaration and should not have been admitted into evidence to prove the truth of the contents of the

conversation. The victim not only had time to reflect upon her statements, but also, by her own admission, fabricated the contents of the conversation. She also stated that she could not talk openly because defendant was nearby and could only answer "Yes" or "No." We agree that even if a statement has been made in response to a question, that does not itself deprive an utterance of the spontaneity necessary to allow its admissibility. (*People v. Watts* (1985), 139 Ill. App. 3d 837, 850, 487 N.E.2d 1077, 1086.) In general, however, this occurs when a victim is asked a question such as "What happened?" The key inquiry in deciding whether such a statement should have been admitted is whether the statement would have been made if the questions had not been asked. *People v. Taylor* (1971), 48 Ill. 2d 91, 97, 268 N.E.2d 865, 868; *Watts*, 139 Ill. App. 3d at 850, 487 N.E.2d at 1086.

In view of the entire context in which this conversation took place, especially the unrefuted fact that defendant was standing near the complainant as she made the telephone call, we cannot say whether the same statements would have been made had the questions not been asked. Moreover, the complaining witness was in large part answering "Yes" or "No" to a series of questions. Her father clearly controlled the content of this conversation.

■ We now address the State's two additional arguments. First, the State contends that the conversation was admissible as evidence of the victim's state of mind because the conversation goes to show that the complaining witness believed that she was forced into the act, not that she consented as defendant theorized. Statements indicating a declarant's state of mind are admissible as exceptions to the hearsay rule only if the declarant was unavailable and there existed a reasonable probability that the testimony was truthful. *People v. Silvestri* (1986), 148 Ill. App. 3d 980, 984, 500 N.E.2d 456, 460; *People v. Bryant* (1984), 123 Ill. App. 3d 266, 275, 462 N.E.2d 780, 785.

In light of the conclusion that this conversation was indeed fabricated, we find that the conversation cannot be admitted to prove the victim's state of mind.

Second, the State also contended that the conversation was admissible as a prompt complaint of rape. While statements qualifying under this rule may also be admissible as a spontaneous declaration, statements by the victim as to what occurred, which are made at a time too remote to qualify as a spontaneous declaration, or sufficient opportunity for "reflection and intervention" having intervened, may gain admission as a corroborative statement. (*People v. Damen* (1963), 28 Ill. 2d 464, 472, 193 N.E.2d 25, 30.) The basis of such a statement's admission is that it is entirely natural that the victim of a forc-

ible rape would have spoken out regarding it, and the fact that she did not do so would, in effect, be evidence of the fact that nothing violent had occurred. *Damen*, 28 Ill. 2d at 472, 193 N.E.2d at 30.

■ The situation in the instant case is much different from the usual complaint allowed into evidence under this exception to the hearsay rule. In fact, in the instant case, the victim, by her own admission, had not been raped when this conversation occurred. Therefore, we find that the conversation cannot be considered a prompt complaint of rape.

■ ■ Because the conversation does not fit under any exception to the hearsay rule, the prosecutor's remarks during closing argument that the conversation was admitted to prove that defendant was armed and that the victim could not get away was clearly improper. Where guilt or innocence depends entirely on the credibility of an accuser and the defendant, no error should be permitted to intervene. (*People v. Emerson* (1983), 97 Ill. 2d 487, 502, 455 N.E.2d 41, 47.) As the facts indicate, the instant case clearly hinged on the credibility of defendant and the victim. Where error is shown to exist, a reversal is mandatory, unless the record affirmatively shows that the error was not prejudicial. (*Emerson*, 97 Ill. 2d at 502, 455 N.E.2d at 47.) Here, the record fails to show that the improperly admitted testimony and the improper oral argument were harmless. The judgment must, therefore, be reversed and the cause remanded for a new trial.

We also feel compelled to answer defendant's second issue, whether defendant was denied a fair trial because the trial court permitted the jury to consider his 1979 robbery and aggravated battery convictions. We are so compelled because defendant's prior convictions will obviously be at issue again. Defendant contends the trial court erred in denying a motion *in limine* to keep out his two prior convictions. Furthermore, defendant contends that the prosecutor's remarks during closing that the prior convictions created a presumption that defendant was willing to lie constituted reversible error. We agree that the prosecutor's remarks were impermissible.

■ It is a fundamental concept in our criminal justice system that evidence of past crimes is not admissible to prove defendant's disposition to commit the crime charged. (*People v. Wright* (1977), 51 Ill. App. 3d 461, 366 N.E.2d 1058.) If a prior conviction is for a felony or a crime involving dishonesty, the trial court has the discretion to allow the conviction to be introduced into evidence to impeach the defendant if the trial court believes the prejudicial effect of the impeachment is outweighed by its probative value on the issue of credibility. (*People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695.) Evidence of a

conviction used to impeach a witness is not admissible if more than 10 years have elapsed since the date of the conviction or the release of the witness from confinement, whichever is the later date. *Montgomery*, 47 Ill. 2d at 516, 268 N.E.2d at 698.

■ In the present case, defendant's prior felonies occurred in 1979. He was tried for the instant offense in 1988, so less than 10 years had elapsed since his date of conviction. Moreover, defendant was released from prison on the 1979 convictions in 1986; therefore, his convictions under the *Montgomery* rule were only two years old at the time of trial and admissible. Whether these convictions are of probative value is a discretionary decision by the trial court, and we find in this case that the trial court did not abuse its discretion.

■ We agree with defendant, however, that improper argument was made by the prosecutor during closing. Defendant argues that several remarks made by the prosecutor were improper, but we find only the following comment requires discussion. During closing argument, the prosecutor stated:

> "Now, what the commission of prior—of a couple of prior felonies tends to show is that he is not telling the truth, because if a person is willing to violate the law to commit a felony, then the law presumes that he is willing to lie."

This remark clearly distorted the law. Prior convictions are evidence that can be used to impeach a defendant, but they certainly do not create a "presumption" that a defendant is willing to lie. It is well established that a prosecutor's misstatements of the law in closing argument can be grounds for reversal. (*People v. Crossno* (1981), 93 Ill. App. 3d 808, 821, 417 N.E.2d 827, 836.) Again, because this case hinged on the credibility of defendant and the victim, we cannot say that the prosecutor's improper argument did not contribute to defendant's conviction. Accordingly, we find that defendant was deprived of a fair trial because of improper remarks by the prosecutor during closing argument.

For the foregoing reasons, the judgment of the circuit court of Marion County is reversed and the cause is remanded for a new trial.

Reversed and remanded.

HARRISON and WELCH, JJ., concur.