(No. 70028.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. STANLEY K. LAWLER, Appellee.

*Opinion filed February 22, 1991.*

MILLER, C.J., joined by HEIPLE, J., dissenting.

Neil F. Hartigan, Attorney General, of Springfield, and Paul Hillis, Jr., State's Attorney, of Salem (Robert J. Ruiz, Solicitor General, Terence M. Madsen and Jack Donatelli, Assistant Attorneys General, of Chicago, and Kenneth R. Boyle, Stephen E. Norris and Raymond F. Buckley, Jr., of the Office of the State's Attorneys Appellate Prosecutor, of Mt. Vernon, of counsel), for the People.

Daniel M. Kirwan, Deputy Defender, and Larry R. Wells, Assistant Defender, of the Office of the State Appellate Defender, of Mt. Vernon, for appellee.

JUSTICE MORAN delivered the opinion of the court:

After a jury trial, the defendant, Stanley K. Lawler, was convicted in the circuit court of Marion County of

aggravated criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—13(a)(1)) and was sentenced to 12 years' imprisonment. The appellate court reversed and remanded the cause for a new trial. (194 Ill. App. 3d 547.) We granted the State's petition for leave to appeal (107 Ill. 2d R. 315 (a)).

The issues raised on review are whether: (1) the appellate court erred in finding that the defendant was denied a fair trial because the jury was allowed to hear the content of a telephone conversation between the complaining witness and her father, in which she alleged that she was being abducted by an armed man, and could not get away; and (2) the appellate court erred in finding that the defendant was denied the right to a fair trial because the trial court allowed the jury to consider the defendant's prior convictions.

The 21-year-old complaining witness testified as follows: that on the evening of July 17, 1987, her 2½-year-old son went to stay with his father (her former husband) in Mt. Vernon, for only the second time; that she was afraid her son would be lonely and frightened, so she called her ex-husband several times and drove by his house repeatedly throughout that evening and during the morning of July 18, because there was no answer on the phone or at his door; that at 3:30 or 4 a.m., she left Mt. Vernon and began to drive to her home in Shattuc, Illinois; that on her way, she saw a car accelerate into the left lane, and pull up next to her; that as the car pulled up next to her, the driver (the defendant) yelled to her that her left rear tire was about to come off; that she then pulled over into a nearby parking lot because she was concerned about her car, as she had earlier driven over a deep pothole; that the defendant followed her into the parking lot; that after she and the defendant looked at her car, and she got into her car to leave, he drew a gun from his waistband and demanded that she move to

the passenger seat so that he could drive; that as he was driving, she told him a story that her ex-husband had stolen her child, that she was part of a search party out looking for him and that if she did not call in, soon the others would start looking for her as well; and that he then drove over to a pay phone so that she could make her call.

Regarding her phone conversation, the complainant testified as follows: that she called her father collect (so that he could trace the call); that the defendant was right next to her the entire time she spoke on the phone; that when her father answered, she told him the story about her ex-husband and her son, and said "to get the police out looking"; that she asked her father if "Liz and Dave" (fictitious names that she used to alert her father) were in; that her father then became concerned and asked her a number of questions that could be answered "Yes" or "No"; that through that format she was able to let her father know that she was with an armed "weirdo," that she was somewhere between Centralia and Mt. Vernon, and that she could not get away; and that her father then told her to try and convince the defendant to take her to the Hardee's in Mt. Vernon, where he would have the police waiting.

The complainant also testified: that she and the defendant then got back into the car, and he drove the car to an isolated location; that he then exited the car and walked to the front of it; that, at that time, she was unsure of where the gun was, so she moved into the driver's seat and tried to start the car; that before she could get away, the defendant pointed the gun at her head and told her she made a serious mistake; that he then forced her to disrobe and move into the back seat; that he then penetrated her vagina with his penis; and that she informed him that she was not using birth con-

trol and asked that he ejaculate into a towel, which he did.

The complainant further testified as follows: that as they put their clothes on, the defendant said she was attractive and that it was a shame that he had to kill her; that she then apologized for not being a better sex partner, and that she would be better if they got something to eat, and suggested the Hardee's in Mt. Vernon; that he stated the Hardee's in Centralia was closer, and began to drive in that direction; that, on the way, the defendant stopped by his car to roll up the windows; that a large black car followed them into the parking lot, which she recognized as her father's; that she opened her door, jumped out of the car, ran to her father's car and told him to shoot the defendant; and that the defendant then drove off.

The complainant identified People's Exhibit No. 1, a Taurus 9 millimeter semiautomatic, as the gun the defendant used to abduct her. She also stated that she did not consent to have sex with him, and only did so to save her life.

The complainant's father testified as follows: that he received a phone call from his daughter in the early morning hours of July 18, 1987; that the conversation was unusual and that he then asked her some questions that could be answered with a "Yes" or "No" and that through this format, he learned that she was with an armed "weirdo," somewhere between Centralia and Mt. Vernon, and she could not get away; that he then called the police, got his gun, and he and his wife picked up the complainant's husband and began looking for her; that he saw a car on the east side of Centralia that looked like his daughter's; that he followed the car into a parking lot, and stopped his car so as to block the entrance to the lot; that his daughter jumped out of the car and told him to shoot the man, so he fired a shot into the air;

that the complainant got into his car and was hysterical, crying and shaking; that he drove by the defendant's car, and had his wife write down the license plate number; and that he then took his daughter to the police station. The complainant's mother and husband related the same accounts as her father.

State Trooper Thomas Olivero testified that he saw a car with the license number that the complainant's mother had provided. He then stopped the car, and arrested the defendant.

Detective Gary Leming testified that the defendant waived his *Miranda* rights and made a tape-recorded statement (which was played for the jury). In the statement, the defendant stated: that he was driving in the area of Centralia around the late evening of July 17 and early morning of July 18; that he saw a car with a badly wobbling rear tire and he alerted the driver (the complainant) that her car had a problem; that he pulled over, and the complainant was crying; that she told him that her ex-husband had taken her child, and she asked him if he would drive her car to help find them because she was so upset; that he drove her in the direction she indicated, and at her request, stopped so she could make a phone call; that after the call, she told him that she was lonely and cold, and he gave her his jacket; that she then embraced and kissed him, and asked him to have sex with her; that he then drove the car to an isolated spot where he parked the car and they then had sex in the back seat; that she told him that she was "not on the pill" so he ejaculated into a towel in the car; that they then drove back to Centralia and he stopped by his car to roll up the windows; that suddenly a black car pulled up and the driver jumped out with a pistol and fired it into the air; that he thought it was the complainant's husband or boyfriend, so he let her get out of the car

and he drove off; and that he later came back for his own car.

Detective Leming also testified that he operated the complainant's car and could find no wobble in either of the rear tires. Ronald Durr, an auto repairman, also stated that after examining the car, he could also find no wobble in the tires.

Lori Lawler, the defendant's wife, testified as follows: that the defendant did own a Taurus 9 millimeter semiautomatic pistol; that on the night of July 17, 1987, the defendant left for work at 8 p.m., and the pistol was still in the house; that she left the house at 10 p.m., to sleep at her in-laws; and that the next morning, she retrieved the pistol, from the same place she had seen it the night before, and gave it to a police officer.

In his own defense, the defendant testified in a manner consistent with the tape recording. He also said that he did not pay attention to the complainant's phone conversation, and did not go to the police after the shots were fired because he was afraid his wife would find out about his sexual encounter.

The defense also called David Winters, the pastor of defendant's church, who testified that the defendant had a good reputation in the community for truthfulness and peacefulness.

Following deliberations, the jury returned a verdict finding the defendant guilty of aggravated criminal sexual assault. The trial court sentenced the defendant to 12 years' imprisonment.

The defendant appealed and the appellate court reversed his conviction and remanded the case for a new trial. The court found that the trial court had erroneously admitted the content of the phone conversation between the complainant and her father because the conversation was hearsay and did not fit into an exception to the hearsay rule. The court additionally found that be-

cause the prosecutor misstated the role that the defendant's prior felony convictions had in assessing his guilt, the defendant was denied a fair trial.

On appeal to this court, the first issue the State raises is whether the appellate court erred in reversing defendant's conviction and remanding the case for a new trial, because the telephone conversation between the complainant and her father was inadmissible hearsay. (194 Ill. App. 3d at 558.) This question breaks down into two parts: (1) whether the statement was hearsay; and (2) if it was hearsay, whether it was admissible under an exception to the hearsay rule.

Hearsay evidence is an out-of-court statement offered to prove the truth of the matter asserted, and is generally inadmissible unless it falls within an exception. (*People v. Carpenter* (1963), 28 Ill. 2d 116, 121.) The State argues that a statement from a witness as to his own prior out-of-court statement cannot violate the hearsay rule, because the witness will testify at trial with the safeguards of an oath and cross-examination, reducing the risk of perjured testimony. Adoption of the State's rationale would essentially obliterate a good portion of the hearsay rule. As has been noted, "[t]he presence or absence in court of the declarant of the out-of-court statement is *** irrelevant to a determination as to whether the out-of-court statement is hearsay." M. Graham, Cleary & Graham's Handbook of Illinois Evidence §801.1, at 564-65 (5th ed. 1990). See *People v. Spicer* (1979), 79 Ill. 2d 173, 179 (where this court held that prior inconsistent hearsay statements of an in-court witness cannot be used as *substantive* evidence).

In the instant case, the jury heard testimony from both the complainant and her father concerning a telephone conversation that occurred while the complainant was with the defendant. As noted earlier, the complainant testified that after she was abducted, she convinced

the defendant to let her make a phone call. As to the content of the call, both the complainant and her father testified as follows: that during the call she asked for "Liz and Dave," and asked that he "get the police out looking"; that he became very suspicious and began asking her a series of questions that could be answered with a "Yes" or "No"; and that through this leading question format, she was able to tell him (1) that she was "alone" with a "weirdo" who was armed, (2) that she was "in trouble" and could not get away, and (3) that she was "sort of" in between Centralia and Mt. Vernon.

Defendant made a motion *in limine* to keep the content of the phone conversation out of evidence. The trial court denied the motion, finding that the statement was not hearsay since it was a device and not an assertion of truth. In the alternative, the trial court found that the conversation was a spontaneous utterance.

It is clear from the record that the prosecution chose to follow the alternative ruling that the conversation was admissible as a spontaneous utterance. In his closing argument, the prosecutor stated:

> "Now [the complainant] testified that she was abducted by Stanley Lawler, that he showed a gun. She called her father, told her father he was armed. You heard her father testify that she called, she was excited, she said in response to his questions, 'Are you with a weirdo?' 'Yes.' 'Is he armed?' 'Yes.' In the course of the very offense itself she managed to cry for help for her father and tell him that this man had a weapon, that he was armed and that she was with a weirdo. Obviously, not consenting to this act if she's crying for help. Okay. There's abundant evidence that he had a weapon."

It is clear from this statement that the prosecutor was arguing that the content of the conversation was factual, and not offered simply for a nonhearsay purpose. In fact, the State notes in its brief that "[t]he

phone conversation was independent evidence" that the complainant did not consent to intercourse. Unlike *People v. Rogers* (1980), 81 Ill. 2d 571, this is not a case where an out-of-court statement was offered to corroborate in-court testimony. (*Rogers,* 81 Ill. 2d at 580.) The statement was clearly used as substantive evidence to prove the truth of the matter asserted, and is clearly hearsay. Thus, the appellate court was correct in holding that the content of the phone conversation was hearsay.

Having found that the content of the phone conversation was hearsay, the next question is whether the content of the conversation was admissible under an exception to the hearsay rule. The State first contends that the statement falls under the state-of-mind exception. An out-of-court statement of a declarant is admissible when that statement tends to show the declarant's state of mind at the time of the utterance. *People v. Britz* (1986), 112 Ill. 2d 314, 320.

The State's argument that the state-of-mind exception applies to this case is not persuasive. The prosecution specifically used the complainant's phone conversation with her father as substantive evidence that the defendant had a gun and that the complainant could not get away. The prosecution did not use the conversation solely as evidence of the complainant's state of mind concerning whether she consented to intercourse. The prosecution never mentioned such a limited purpose for the evidence at the trial, and it is clear from the prosecutor's closing argument (as earlier quoted) that the phone conversation was used as substantive evidence of the content of the conversation.

Secondly, the State also argues that the conversation was admissible under the spontaneous declaration exception to the hearsay rule. There are three requirements for a statement to qualify as a spontaneous declaration:

" '(1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) absence of time to

fabricate; and (3) the statement must relate to the circumstances of the occurrence.' " *People v. Damen* (1963), 28 Ill. 2d 464, 471, quoting *People v. Poland* (1961), 22 Ill. 2d 175, 181.

Questioning of the declarant by a third party may destroy spontaneity, but a simple question such as "what happened" will not. (*Damen*, 28 Ill. 2d at 472.) Persistent questioning, however, will destroy spontaneity. (*People v. Taylor* (1971), 48 Ill. 2d 91, 97.) In *Taylor*, a girl told a fireman that she had been raped, but only after he persistently questioned her. The court noted that "had the questions not been asked the statement would not have been made." *Taylor*, 48 Ill. 2d at 97.

Applying the aforementioned principles to the instant case, it is clear that the alleged abduction of the complainant was an event that would qualify as "sufficiently startling." However, by the complainant's own admission, she fabricated much of the conversation with her father; thus, she obviously had enough time to reflect on the situation, conceive of a fabrication, and execute that fabrication in making her phone call. Additionally, she conveyed information to her father via a series of leading questions that she could answer "Yes" or "No." Unlike *Damen*, where the declarant made a spontaneous statement in response to the question "what happened" (*Damen*, 28 Ill. 2d at 471), here the complainant merely adopted the assertions of her father as her own. Therefore, the phone conversation is not admissible under the spontaneous declaration exception to the hearsay rule.

Finally, the State argues that the phone conversation was properly admissible under the "prompt complaint of a rape" exception to the hearsay rule. The "prompt complaint of a rape" exception allows into evidence a declaration by a rape victim that she was raped which was made at a time too remote to be considered a spontaneous utterance. (*Damen*, 28 Ill. 2d at 472.) "The basis of [the admis-

sion of these declarations] is that it is entirely natural that the victim of forcible rape would have spoken out regarding it, and the fact that she did not do so would in effect be evidence of the fact that nothing violent had occurred." *Damen*, 28 Ill. 2d at 472.

In the instant case, the appellate court noted that the rape did not occur at the time of the phone conversation, so the "prompt complaint of a rape" exception to the hearsay rule was not applicable. (194 Ill. App. 3d at 558.) The State argues that the rape had, in fact, begun, as the complainant testified that the defendant was kissing her on her neck without her permission at the time of the phone call. According to the State, the rape was in progress, so the call was a prompt complaint of that rape.

In regards to the "prompt complaint of a rape" exception to the hearsay rule, this court has held that "[the complaint] must have been spontaneous and not made as a result of a series of questions to which answers were given." (*Damen*, 28 Ill. 2d at 473.) Even if, as the State asserts, the alleged sexual assault had begun and the phone conversation could meet the spontaneity requirement, the conversation still fails the prompt-complaint test, as the "complaint" was simply the adoption or rejection of a series of leading questions formulated by the complainant's father. See *Taylor*, 48 Ill. 2d at 97.

As the content of the phone conversation does not fit into any of the exceptions to the hearsay rule, the admission of the content of the conversation was error. The error was compounded by the prosecutor's remarks in closing argument concerning the conversation, where he stated that the conversation "proved" that the defendant was armed and that the complainant could not get away.

"Where guilt or innocence depends entirely on the credibility of an accuser and the defendant, no error

should be permitted to intervene." (*People v. Emerson* (1983), 97 Ill. 2d 487, 502.) Since the crucial question in this case was whether the complainant consented to intercourse with the defendant, the guilt of the defendant hinged entirely on the credibility of the complainant and himself. When error is shown to exist, a reversal is mandatory, unless it is clearly shown that the error was not prejudicial. (*Emerson*, 97 Ill. 2d at 502.) Here, the record does not show that the error was harmless, as much of the State's case was dependent upon the substantive use of the complainant's phone conversation with her father. Thus, the appellate court acted properly in remanding this case for a new trial.

The State also argues that the appellate court erred in finding that the defendant was denied a fair trial because the trial court permitted the jury to consider the defendant's prior convictions. Prior to trial, the defendant filed a motion *in limine* to keep out his nine-year-old, 1979 felony convictions for robbery and aggravated battery. The motion was denied. As a result, this evidence was used by the State to impeach the defendant's testimony at trial.

During closing argument, the prosecutor made the following statement:

"[The defendant] has two prior felony convictions *** the only reason that is relevant is to the issue of credibility. Now if a guy—again, this is another instance where Stanley Lawler is willing to do what Stanley Lawler wants to do."

Defense counsel's objection was overruled, and the court stated:

"The Court will instruct the jury as to the law, and the Court has already instructed the jury that the introduction of evidence concerning the defendant's prior conviction is for the limited purpose of judging his credibility.

The jury will disregard any remarks by counsel to the contrary."

The prosecutor's next remarks were:

"Now, what the commission of prior—of a couple of prior felonies tends to show is that he is not telling the truth, because if a person is willing to violate the law to commit a felony, then the law presumes that he is willing to lie."

The appellate court found that the prosecutor's second remark during closing argument was reversible error because a prior conviction does not create a "presumption" that a defendant is willing to lie, as a matter of law. The court further found that because the case hinged on the credibility of witnesses, the comment deprived the defendant of a fair trial. 194 Ill. App. 3d at 559, citing *People v. Crossno* (1981), 93 Ill. App. 3d 808, 821.

Evidence that the defendant committed other crimes is inadmissible to show that the defendant had a propensity to commit crime. (*People v. Lindgren* (1980), 79 Ill. 2d 129, 137.) However, if the prior crime is for felony or other crime involving dishonesty, then, at its discretion, the trial court can allow the conviction to impeach the defendant, so long as it feels that the prejudicial effect of the evidence is outweighed by its probative value of the defendant's credibility. (*People v. Montgomery* (1971), 47 Ill. 2d 510.) Evidence of a conviction used to impeach a witness is not admissible if a period of more than 10 years has elapsed since the date of conviction or release of the witness from confinement, whichever is later. *Montgomery*, 47 Ill. 2d at 516.

In this case, the defendant's prior felony convictions were in 1979, and he was released in 1986. The trial, in the instant case, was in 1988. Thus, under *Montgomery*, it was within the trial court's discretion to allow the prior conviction into evidence for impeachment purposes.

This court cannot find that the trial court abused that discretion.

In his closing argument, the prosecutor clearly misstated the law by arguing that, because the defendant committed crimes in the past, "the law presumes that he is willing to lie." However, the appellate court erred by not properly taking into account the jury instructions, which may have had a curative effect on the improper argument. In this case, the trial court gave very specific instructions as to how the jury should consider the evidence of the defendant's prior convictions: that it should consider the prior convictions only as evidence of his believability, and not as evidence of his guilt (Illinois Pattern Jury Instructions, Criminal, No. 3.13 (2d ed. 1981) (hereinafter IPI Criminal 2d)); and that any statement by an attorney that was contrary to the evidence should be disregarded (IPI Criminal 2d No. 1.03). The trial court also instructed the jury that the defendant was presumed innocent throughout the trial, and the State had the continuing burden of proving him guilty beyond a reasonable doubt (IPI Criminal 2d Nos. 1.01, 2.03).

The Supreme Court has recently explained:

> "[A]rguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence, *** and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law. [Citations.] Arguments of counsel which misstate the law are subject to objection and to correction by the court." (*Boyde v. California* (1990), 494 U.S. 370, 384, 108 L. Ed. 2d 316, 331-32, 110 S. Ct. 1190, 1200 (finding that a prosecutor's argument did not induce the jury to reach an impermissible interpretation of law in consideration of mitigating factors at a death penalty hearing).)

The Court has also noted that "the arguments of counsel, like the instructions of the court, must be judged in

the context in which they are made" and the arguments of counsel do not have the same impact on the jury as do the jury instructions. *Boyde v. California*, 494 U.S. at 385, 108 L. Ed. 2d at 332, 110 S. Ct. at 1200.

When reviewing the whole context of the prosecutor's closing argument in this case, it is clear that he made an improper statement of the law concerning the defendant's prior convictions. However, as the trial judge told the jury on numerous occasions that the evidence was to be used solely on the issue of the defendant's credibility, and because the jury was properly instructed on the law regarding the prior convictions, the prosecutor's misstatement was of little consequence and, thus, not reversible error.

For the foregoing reasons, the judgment of the appellate court is affirmed.

*Appellate court affirmed.*

CHIEF JUSTICE MILLER, dissenting in part:

I do not agree with the court's conclusion that the defendant was denied a fair trial by the admission into evidence of testimony relating the contents of the victim's telephone call to her father. In my view, the telephone conversation was a prior consistent statement and, under the circumstances shown here, was properly introduced by the State to counter the defendant's charge that the victim's trial testimony was fabricated. Accordingly, I dissent.

As the majority opinion states, the victim placed the telephone call shortly after the defendant took control of her vehicle at gunpoint. In the course of the telephone conversation, the victim managed to alert her father that she was in trouble. Through a series of questions, the victim's father was able to ascertain that his daughter was being held by an armed "weirdo" and that she was then located somewhere between Mt. Vernon and

Centralia. After the call was made, the defendant drove the victim to a secluded area, where he raped her.

The defendant later returned with the victim, in the victim's car, to the parking lot in which he had left his own vehicle. The defendant was followed into the lot by an automobile being driven by the victim's father, who, accompanied by the victim's mother and husband, had begun looking for his daughter immediately after receiving her telephone call. Upon arriving at the lot, the victim jumped out of the car and the defendant drove off. The victim, who was crying and hysterical, was taken to a hospital for treatment. The defendant asserted, both at the time of his arrest and later at trial, that he and the victim had engaged in consensual sexual relations.

Evidence of a prior statement by a witness that is consistent with the witness' testimony at trial may be introduced to show that the person related the same account of events on an earlier occasion, before the time of an alleged fabrication or the existence of an alleged motive to testify falsely. See *People v. Shum* (1987), 117 Ill. 2d 317, 340-41; *People v. Titone* (1986), 115 Ill. 2d 413, 422-23; *People v. Emerson* (1983), 97 Ill. 2d 487, 499-501; *People v. Clark* (1972), 52 Ill. 2d 374, 389-90. See also M. Graham, Cleary & Graham's Handbook of Illinois Evidence §611.14 (5th ed. 1990).

Properly analyzed, the evidence of the victim's telephone conversation with her father was admissible as a prior consistent statement. Throughout the present proceedings, the defendant has challenged the veracity of the victim's trial testimony and has attempted to portray the victim as a willing sexual partner. The contents of the victim's telephone call could therefore be introduced into evidence to counter the defense theory. The call was made prior to the time of the alleged fabrication. In the telephone conversation, the victim was able to communicate to her father that she was in danger and that she

was being held against her will. This evidence corroborated the victim's trial testimony and contradicted the defendant's claim of consent. In the present case, the challenged evidence is particularly reliable because the telephone conversation was contemporaneous with the facts it related. Under these circumstances, I would conclude that the testimony detailing the victim's telephone call to her father was properly admitted into evidence.

The defendant raises one additional allegation of error, which concerns the prosecutor's argument to the jury on the import of the defendant's prior convictions. I agree with the majority that the prosecutor overstated the impeaching effect of the convictions but that the prosecutor's brief comment did not deny the defendant a fair trial. The jury was properly instructed on the significance of the impeaching evidence, as well as on the purpose of closing argument, and the prosecutor's remark was not unduly prejudicial. Accordingly, I would affirm the judgment of the circuit court.

JUSTICE HEIPLE joins in this dissent.