THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JEFFREY CHAPMAN, Defendant-Appellant.

First District (5th Division)    No. 1—90—3014

Opinion filed December 11, 1992.

Michael J. Pelletier and Karen Daniel, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Christine Cook, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

The defendant, Jeffrey Chapman (Chapman), was convicted of first degree murder and armed robbery after a jury trial. Chapman was sentenced to concurrent terms of natural life and 30 years in the Illinois Department of Corrections. The facts of the case are as follows.

William Veber (Veber), the brother of the victim, Linda Veber, testified that on May 24, 1988, he returned home and took a nap. Linda woke him up and asked him to move his car because it was blocking her way. The victim was wearing a blue jean skirt, a black sweater, and a black leather jacket. The following morning, Veber and his parents called the police station, hospitals, and the victim's friends in an attempt to locate the victim. Nine days later, the Hillside police notified the Veber family that Linda was found in Lake Michigan. Veber also testified that the victim drove a 1987 IROC Camaro with Illinois license plates that said "B-R-A-T 4." The last time Veber saw Linda's car, there was nothing wrong with the front passenger seat.

Susan Sabel (Sabel), the victim's best friend, testified that on May 22, 1988, at about 6 p.m., Sabel and Linda drove to Memorial Park in Linda's car. The two women met defendant at the park. When the victim and Sabel arrived at the park, defendant said the victim's car looked nice as well as commenting that she must have just waxed it. The victim, defendant and Sabel decided to go to Sabel's house. Defendant followed the women in his old grey Honda Civic.

The three sat on Sabel's front porch talking for awhile. Sabel went inside the house to lay down on the couch. She heard defendant

ask Linda if she wanted to get more beer and then ask if they could take her car. The two left in defendant's car, returning in approximately 10 minutes. They sat on the porch and drank beer. Linda came into the house. Ten minutes later, Sabel went outside and told Linda that her boyfriend was on the phone and wanted to come over. Defendant left.

Sabel talked to Linda on the phone twice on May 24, 1988. Linda told Sabel that she was supposed to meet Chapman that night.

Thurmond Posley (Posley) testified that in May 1988 he lived with defendant and another person. Around 9 p.m., on May 24, 1988, Chapman rang the bell and told Posley that he was moving out to stay with his aunt. Chapman was in a rush trying to get his things together.

The court granted the State's motion *in limine* to preclude reference to Antonio Hutchinson's pending criminal case and his previous unlawful use of a weapon (UUW) misdemeanor conviction. Antonio Hutchinson (Antonio) testified that on May 24, 1988, around 9 a.m., he was at his mother's house and heard defendant pull up in his car and blow the horn. Defendant asked Antonio if he knew where he could sell his car. Antonio stated that he and defendant drove down Western Avenue trying to sell defendant's car, but were unsuccessful due to the fact that defendant did not have the title to the car. While driving down Western Avenue, defendant and Antonio passed an IROC Camaro and defendant commented while rubbing his hands together, that the car was "sharp" and "I'm going to have me one."

Antonio testified that he and Chapman returned to his house around 1 p.m. His mother returned from work around 4 p.m. Defendant returned around 8:30-9 p.m. and pulled up in a red Camaro. The red IROC Camaro had "B-R-A-T-T" license plates. When asked where he got the car, Chapman replied that he "popped the old girl" about five or six times. Chapman was rubbing his hands together and pacing back and forth, and asked Antonio to get him a towel so he could get "the stuff" off his seats. Antonio testified that he told defendant he could not give him a towel and then returned upstairs.

Antonio further testified that Chapman returned 45 minutes later. Antonio looked out the window and saw two cars, the red Camaro and Chapman's grey Honda. He also saw defendant bend down at the Camaro and move a bag from the grey Honda to the red Camaro. A man with a high top haircut was with Chapman. Chapman then closed the trunk and pulled off. Antonio testified to his juvenile armed robbery offense when he was 15 years of age, to his adult conviction, and the pending case involving possession of a controlled substance. He also stated people sometimes call him Tony.

On cross-examination, Antonio admitted that he did not tell the police the truth right away. He denied ever meeting Linda as well as involvement in her murder. Antonio testified that he told police that defendant told him about a white girl from the suburbs named Linda, and that she had a fully equipped IROC. Antonio also told police that Chapman had a gun and wanted to do stick-ups together. "Old girl" is a slang term for "mothers."

Johnny James Smith (Smith), a police officer in East Point, Georgia, testified that on May 28, 1988, he was on patrol alone. At approximately 12:30 a.m. he pulled up to a Tenneco gas station. Smith noticed that the burgandy Camaro in the lot had expired Michigan license plates and called in the plates to the communications center. Smith discovered that the plates belonged to a Honda. Smith double-checked, and when he was told that the plates belonged to a Honda, Smith went to the convenience store and asked the clerk if the car was hers. The clerk said no, it belonged to Chapman. Smith asked the defendant what color the car was, and the defendant replied that it was burgandy. Smith further testified that he went outside and ran the vehicle identification number (VIN). He discovered that the car belonged to a missing person, Linda Veber.

Smith drove across the street and waited for Chapman to leave. After approximately 20 to 25 minutes, Chapman got in the car and began to pull away. Smith stopped Chapman and asked to see his driver's license, registration and insurance identification card. When defendant could not produce any of the requested items, Smith ran a name check and was informed that defendant was wanted in Michigan. Defendant was arrested and the Camaro was impounded.

Brigit Breitzman (Breitzman), one of Linda's co-workers, testified that Linda drove a rust-colored IROC. On May 24, 1988, she and Linda went to Linda's house for lunch. Breitzman noticed that the victim had some clothes and a camera in the car. The passenger seat was not broken. On that same day, Breitzman picked up the victim's phone at work. After taking the call and hanging up, Linda told Breitzman that she was going to say goodbye to Chapman.

Melissa Hutchinson (Melissa), Antonio's mother, testified that on May 24, 1988, she returned from work around 4 p.m. She stated that her son never left the house that night. Around 8:30 to 9 p.m., Chapman arrived at her house. When she looked out the window she saw Chapman standing next to a red IROC-Z. Antonio went downstairs to talk with Chapman. Chapman left, but returned about an hour later and replaced the license plates on the red car. Defendant's grey Honda was next to the IROC. Antonio did not go outside the second time defendant returned. Melissa also testified that her brother-in-

law is Joel Hutchinson, Sr., whose nickname is Turk. Joel Jr. is called "Little Turk."

On cross-examination, Melissa denied calling defendant's mother and telling her that Chapman and Antonio were involved in the killing of a young white woman. Further, she denied telling defendant's mother that she got rid of the gun and defendant's car and not to worry about anything.

Rashiid Shareef, Chapman's father, testified that on the morning of May 27, 1988, he found his son parked outside his house in Griffin, Georgia, in a burgandy Camaro with an out-of-State license plate which read "BRAT 4." Chapman told Shareef that he had gotten into a dispute with someone regarding drugs, the person had been hurt, and Chapman had therefore left Chicago. Chapman said he borrowed the car from a friend. Shareef obtained Chapman's permission to drive the car to a restaurant, and Chapman went into the house carrying a plastic bag of clothing.

Upon his return, Shareef asked to see the registration for the car. When Chapman could not produce it, Shareef accused him of not telling the truth about what had happened. Chapman then stated that the car belonged to the "guy" who had been shot. Shareef told Chapman that he did not have any money for him and that Chapman would have to leave. Chapman responded that he knew some people in Atlanta, he would try to get some money, and he would be back in a couple of hours. While he was gone, Shareef telephoned Jeffrey's mother, Rita Chapman, who lived in Muskegon Heights, Michigan. Mrs. Chapman said that defendant had been in Muskegon before going to Atlanta. Mrs. Chapman also mentioned the name Tony, and said that the victim was a girl who had been killed over a car. At trial Shareef testified that Mrs. Chapman never said defendant admitted killing the girl, but Shareef acknowledged his signature on a statement which said that defendant told his mother he had killed a girl. Shareef explained that this statement was not verbatim and had been written by the police officers who had interviewed him; Shareef did not tell the officers defendant had admitted killing someone.

Shareef later drove around looking for defendant. At approximately 5:30 p.m., he found Chapman walking. When defendant got into Shareef's truck, Shareef told him he had spoken with Rita Chapman. Chapman seemed surprised and asked whether the person had been found. Shareef suggested that Chapman turn himself in to the sheriff, but Chapman did not want to do so. At some point Chapman told Shareef that he had parked the Camaro in a park in Atlanta which was at least 10 miles away and had left the keys in the ignition.

Chapman got out of the truck with the bag of clothing he had been carrying, walked down the road, and turned into a wooded area which led to an apartment complex. When Shareef drove in that direction, he saw Chapman driving toward him in the Camaro. Chapman said, "Dad, I'm sorry" as he passed Shareef while driving out of the apartment complex. Shareef testified that he was very surprised when Chapman said he was in trouble and that Chapman was an extremely low-key, docile person.

Jack Lambert (Lambert), a detective sergeant in East Point, Georgia, was assigned to look at a car on May 28, 1988. When Lambert looked inside the car he noticed there was a cover on the front passenger seat. On June 16, 1988, Lambert spoke with two Chicago police officers and took them to the police garage pound. When the cover was removed from the passenger seat, Lambert saw dark spots on the seat which he thought may have been blood. Lambert further testified that the Chicago police officers recovered a bullet from the back of the seat. On August 17, 1988, Lambert removed the seat to send it to the Chicago police department. At that time, he found another bullet on the floor of the car near the bolt.

Chicago police officer Michael Carroll testified that on June 16, 1988, Shareef stated in an interview that Rita Chapman told him Jeffrey Chapman had admitted killing a girl in Chicago over a car. A summary, not verbatim, account of this statement was reduced to writing by Carroll's partner, and Shareef signed it without making any changes. FBI agent James Eckel, who was also present for the statement, testified similarly.

Dr. Barry Lifschultz was qualified as an expert in forensic pathology. He testified that he performed the autopsy on the victim. He found two gunshot entrance wounds on the victim's back. One of the wounds was surrounded by a soot stain, which is typical of a contact gunshot wound. The victim's bra also had a soot stain, which was strong evidence of a very close-range firing. The two entrance wounds were very close together. Dr. Lifschultz further testified that the victim died as a result of gunshot wounds and the manner of death was homicide.

Jeffrey Chapman took the stand in his own defense. He testified that after his conviction for embezzlement from his employer, he became a fugitive from Michigan by walking away from a halfway house. Chapman came to Chicago and contacted his cousin, Antonio Hutchinson. He met Linda Veber after being in Chicago for a week and a half. Chapman stayed in Chicago for about a month, spent the next month in Atlanta, then went to Muskegon, where after two weeks he was arrested for a broken taillight and sent back to jail.

Chapman spent two months in custody and was sent to another halfway house, after which he again came to Chicago. For the first two weeks he stayed at the homes of his aunt and Antonio Hutchinson. During this time Antonio often suggested that the two of them go to Hyde Park to snatch purses, but Chapman refused. After Chapman obtained a job he moved in with another cousin for three weeks and then stayed with his friend Thurmond Posley on the north side of Chicago.

One day when Chapman telephoned his family to see how they were doing, Antonio asked him to come by the next day, Saturday. Chapman picked up Antonio and drove to Water Tower Place to meet Linda. Chapman wanted Antonio to meet a friend of Linda's named Debbie who worked there, but since Debbie was unavailable the three of them went to a movie and walked around the mall. Later, Antonio expressed his interest in Linda to Chapman. The next day, Sunday, Chapman spent a couple of hours in Hillside with Linda and a friend of hers.

Chapman next testified that he called Linda one morning and spoke with her for a minute, as was their habit. Chapman also called Antonio, who said he had an idea for him to get money to go to the Netherlands. According to Antonio's plan, they would put a couple of drops of Visine in Linda's drink which would act as a knockout drug, take her to a hotel and leave her there unconscious, and then sell her car to a chop shop. Linda would not be able to find Chapman because she knew him as Jeffrey Woods. Chapman called Linda and told her he wanted to see her the next day before he left, and she agreed. Chapman then called Antonio back and told him everything was set. When Chapman telephoned Linda again and said that Antonio was coming too, she was elated because the two of them had hit it off at Water Tower Place.

The following afternoon, Chapman picked up Antonio and they drove to a park in Hillside where they met Linda. The three of them bought beer and drove to the 31st Street beach, with Chapman driving alone and Antonio riding with Linda. At the beach, Chapman got in the back seat of Linda's car and Antonio passed him the Visine. Chapman squeezed some Visine into Linda's beer before giving it to her. They all talked, but the conversation was stilted because Chapman and Antonio were waiting for Linda to drink her beer, which she did not do. Antonio had the vanity mirror down and made facial expressions at Chapman for him to try to get Linda to drink her beer, but Chapman just shrugged because he was having second thoughts.

Chapman subsequently testified that he got out of the car and

followed Antonio to a group of trees 30 feet from the parking lot; Linda was lying there. Antonio said that he shot her in order to get the car and ordered Chapman to grab her legs. Chapman complied because he was scared and knew Antonio had a gun. Antonio took her arms and they carried her to the car. Antonio asked for the keys to Chapman's car to put the gun in the trunk, and returned with a seat cover which he put in Linda's trunk so as not to get blood on the seat. As they were putting Linda into the car, Chapman heard her breathe and told Antonio she was still alive and they should take her to a hospital. Antonio, however, took the gun out of his coat pocket and shot her again, then closed the door. Antonio said he would drive Chapman's car while Chapman drove Linda's car. Chapman did not challenge him because he still had a gun. Chapman followed Antonio along Lake Shore Drive to a spot by the lake; he did not pull off the road because he knew he was wanted in Michigan and felt the police would not believe him. Chapman helped throw Linda into the lake.

Chapman testified that Antonio said that he had to get rid of the gun, so he followed him to Antonio's building. Antonio went upstairs and stayed for 10 or 15 minutes, during which time Chapman saw Antonio's mother, sister and someone else look out the windows at him. Antonio returned with a butter knife and said they had to take the plates off the car. Antonio took the plates off both cars and Chapman changed them. Antonio went back upstairs and was going to come right back. After 30 minutes Antonio had not returned, and Chapman decided to take Linda's car and get rid of it.

Chapman first drove to Posley's apartment and said he was moving out, leaving a fake forwarding address and phone number. He then drove to Muskegon, Michigan, and spent a day thinking about how to get rid of the car. He then went to his mother's home. Mrs. Chapman told him she had spoken to Melissa Hutchinson the other night on the telephone. After his mother gave him some money, Chapman showered and left for Atlanta to see his father.

Chapman arrived at his father's house late and spent the night in the car; his father woke him in the morning. Chapman told his father that he was in trouble and that he had been selling drugs in Chicago and the car belonged to one of the guys. He allowed his father to use the car, and when his father returned he asked to see the registration. When Chapman was unable to produce the registration, he told his father that the owner of the car was a guy who had been shot. Chapman's father told Chapman how foolish he had been for bringing a car involved in a murder to that house and refused to give Chapman any money Chapman left and unsuccessfully searched for a friend in the hope of borrowing money. He later parked

Linda's car in an apartment complex parking lot with the windows down and the keys in the ignition in the hope that someone would take it. After Chapman's father found him again, the two of them discussed Chapman's involvement in the incident, but Chapman did not say he had shot the victim. When his father told him to turn himself in Chapman grabbed his clothes and began walking into the woods. He then decided to seek his friend again, so he retrieved Linda's car and drove to the store where his friend worked. Chapman waited because the clerk on duty said that the friend had left but would be back later. When Chapman saw a police officer outside writing down the VIN of Linda's car, he knew what would happen but decided he was tired of it all and they could come and get him. After returning to the car Chapman gave his name and date of birth to the officer but said he did not know who owned the car and had gotten it from Tony.

Chapman testified that after his arrest and extradition to Michigan, he was interviewed by Chicago police officers. He gave the officers false statements regarding the incident. This included allegations that his cousin Tony and a 10-year-old relative nicknamed "Little Turk" had been involved in the murder. Chapman also acknowledged that he had taken his brother's identification without his brother's knowledge.

Rita Chapman testified that on May 24, 1988, Melissa Hutchinson contacted her by telephone. Melissa said she had the gun and would get rid of it. The next morning Melissa called again and said she had taken the gun apart and had disposed of it, and had sold defendant's car to a dealer. Rita informed her that the car would be traced because the bank wanted to repossess it. Melissa called back that night and said she had gotten the car back from the dealer and had sold it to a "strip joint" so it would never be found. Based on her conversations with Melissa, Rita believed that Antonio Hutchinson had been involved in the crime. Melissa told Rita that defendant had killed a girl, but defendant told her it was Antonio, not he, who had done it.

Elizabeth Groves, defendant's great-aunt, testified that during a conversation, shortly after Chapman was in trouble for the murder, her niece Melissa Hutchinson said she was going to dispose of Chapman's car.

Sue Sabel testified for the State in rebuttal that the Saturday before Linda's disappearance, she spent the day with Linda at the Stratford shopping mall in Schaumburg, and spent the evening with her at Linda's home. In surrebuttal, defendant testified that the Saturday he had testified about was not the Saturday before the murder, but rather the preceding Saturday.

The jury instructions covered guilt both as a principal and by accountability, and included an instruction on withdrawal from a crime. The withdrawal instruction was requested by the prosecution after defense counsel's closing argument, and the trial court agreed to give it over defense counsel's objection. The jury returned verdicts of guilty on the charges of first degree murder and armed robbery.

On appeal the defendant presents the following issues for review: (1) whether Chapman was denied his constitutional right to effective assistance of counsel; (2) whether the State improperly impeached its own witness with a prior inconsistent statement; (3) whether the prosecutor's closing argument denied the defendant a fair trial; (4) whether the trial court erred in excluding evidence of State witness Antonio Hutchinson's prior conviction for unlawful use of a weapon; (5) whether the trial court abused its discretion in sentencing Chapman to natural life imprisonment; and (6) whether Chapman was denied his right to an impartial judge at the sentencing hearing.

For the following reasons, we affirm the decision of the trial court.

I

Defendant argues that he was denied his constitutional right to the effective assistance of counsel where counsel's ability to defend Chapman was undermined by his misunderstanding of the law of accountability and where counsel failed to object on numerous occasions to inadmissible evidence and improper prosecutorial argument to the jury.

A defendant alleging a violation of his sixth amendment right to effective assistance of counsel must generally meet the two-pronged test announced by the United Stated Supreme Court in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, in order to establish a valid claim. In order to establish ineffective assistance of counsel under *Strickland*, the defendant must show (1) that his counsel's performance was deficient by having made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the sixth amendment, and (2) that his counsel's deficiencies prejudiced the defendant. (*Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.) The *Strickland* test was adopted by the Illinois Supreme Court in *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246. Matters of trial strategy will not be held to constitute ineffective assistance, but acts or omissions by counsel will not be considered matters of strategy where there is no sound tactical reason that could conceivably support the act or omission. (*People v. Garza* (1989), 180 Ill. App. 3d 263, 269, 535 N.E.2d 968.) The defendant must show that there was a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the trial outcome. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

Chapman testified that he and his cousin, Antonio, lured Linda on an outing with the intention of administering a "knockout drug" in her beer and stealing her car. According to Chapman, when Veber failed to drink the beer, Chapman had second thoughts about the plan and signalled to Antonio to forget the whole thing by shaking his head and raising his eyebrows. However, on his own, Antonio shot Linda in order to steal her car.

Defendant argues that under Illinois accountability law, the above acts by Chapman rendered him accountable for the murder and armed robbery unless he effectively withdrew from the crime prior to its commission. (See Ill. Rev. Stat. 1987, ch. 38, par. 5—2.) The accountability statute includes a provision that a person is not accountable for the conduct of another, if "[b]efore the commission of the offense, he terminates his effort to promote or facilitate such commission, and *** wholly deprives his prior efforts of effectiveness in such commission." Ill. Rev. Stat. 1987, ch. 38, par. 5—2(c)(3).

Defendant argues that because counsel failed to understand accountability, he also failed to appreciate the significance of withdrawal. At trial, defense counsel presented two separate plans. The first plan involved Chapman and Antonio knocking out the victim and stealing her car. Chapman shook his head and raised his eyebrows and the first plan was terminated. The second plan involved Antonio's sole decision to kill the victim. If the jury believed the second plan, it would not have found Chapman guilty of first degree murder because he was not involved in the second plan.

■ The State argues, and we agree, that if defense counsel had tendered the withdrawal instruction, or harped on the theme of withdrawal in closing arguments, it would have implied the very premise that counsel was attempting to exclude: that defendant was involved in the murder scheme. The accused is entitled to competent, not perfect, representation, and the fact that a defense tactic was unsuccessful does not retrospectively demonstrate incompetence. *People v. Schmidt* (1988), 168 Ill. App. 3d 873, 882, 522 N.E.2d 1317.

Defendant also argues that defense counsel was incompetent in setting the stage for the State to introduce evidence that Shareef signed a written statement saying that Rita Chapman told him defendant had admitted killing a girl from a Chicago suburb over a car. Defendant argues that it is clear that this information would have never been presented to the jury had defense counsel not repeatedly

asked Shareef questions about what Rita Chapman told him over the phone. The contents of Shareef's statement were allowed in only for impeachment purposes. Shareef testified that this was not a verbatim statement, but rather a summary made by the police officers. Defense counsel's questions of Shareef indicated that Tony was involved, corroborating defendant's allegations to this effect. We find that defense counsel's questions in this area were a matter of trial strategy and therefore do not constitute ineffective assistance of counsel.

Defendant further argues that counsel's error also included failure to object to the State's impeachment of its own witness, failure to object to prosecutorial closing argument, and failure to specify in his motion for a new trial the exclusion of Antonio's prior conviction for unlawful use of a weapon. We address each of these issues later in this opinion and have found that the State properly impeached its own witness, the prosecutor's closing argument was proper or harmless error and that the trial court properly excluded Antonio's previous conviction for unlawful use of a weapon. Thus, we find no merit to defendant's argument that these actions or inactions rendered defendant's trial counsel ineffective.

The record as a whole satisfies us that the State's case was subjected to a meaningful adversarial testing. Accordingly, defendant is required to demonstrate a reasonable probability that the outcome would have been different in order to establish a violation of the sixth amendment. (See *People v. Schmidt* (1988), 168 Ill. App. 3d 873, 522 N.E.2d 1317.) In the present case, in light of the competent, if imperfect, representation and the overwhelming evidence of guilt, we do not find that the defendant was denied a fair trial.

## II

Defendant argues that the State improperly impeached its own witness where the witness' testimony did not damage the prosecution's case. Defendant claims this impeachment was prejudicial to Chapman where it consisted of inadmissible hearsay evidence that he had committed the offense.

The State called Chapman's father, Rashiid Shareef, as a witness during its case in chief. On direct examination, Shareef testified regarding his contact with Chapman at his home a few days after Linda's murder. Shareef stated that he had telephoned Chapman's mother, Rita Chapman, and subsequently told Chapman that he had spoken with his mother.

On cross-examination, Shareef testified that he received information about who was involved in the victim's murder. Shareef testified that he learned that Tony was involved from Rita Chapman. On

redirect examination, Shareef testified that his conversation with Rita Chapman was where he first heard the name of Tony. Shareef further testified that Rita Chapman told him the victim was a girl, but that she did not tell him who killed her. Subsequently, the State impeached him with a statement prepared by police officers and signed by Shareef. The statement indicated that defendant had told his mother he killed a girl from a Chicago suburb over a car.

Shareef testified that he had not personally written the statement and it was inaccurate because he never told the interviewing officers that Rita Chapman said defendant killed someone. However, Shareef admitted signing the statement as well as the fact that he was given the opportunity to read the statement and make corrections on it before signing it. The contents of the written statement were reiterated to the jury during the testimony of the two officers who participated in the taking of the statement, James Eckel and Michael Carroll.

Defendant claims that this impeachment by the State of its own witness was improper because Shareef's testimony did not damage the State's case, whereas the otherwise inadmissible evidence that defendant admitted killing the victim was prejudicial to the defense.

Supreme Court Rule 238(a) provides that the "credibility of a witness may be attacked by any party, including the party calling him." (134 Ill. 2d R. 238(a).) A party's "right to impeach *** with prior inconsistent statements is not unlimited; but where the testimony is damaging, a party can impeach his own witness without having to demonstrate surprise." *People v. Spence* (1989), 188 Ill. App. 3d 761, 765, 544 N.E.2d 831.

■ The State argues that when Shareef denied telling the police that Rita told him defendant admitted killing the victim, its impact was quite damaging to the State's case because it exculpated the defendant. The State further argues that it was important that the jury properly determine the credibility of all the witnesses. We find that under the facts of the case it was proper for the State to impeach its own witness.

### III

Defendant argues the prosecutor's closing argument denied him a fair trial. Conversely, the State maintains that (1) the remarks were properly based on legitimate inferences drawn from the evidence, and (2) the defendant failed to object to remarks at trial and in a post-trial motion, therefore waiving the issues on appeal.

Defendant argues that although defense counsel did not object to the State's use of Chapman's prior criminal conduct as evidence of

his propensity to commit crime, or the prosecutor's baseless argument that Chapman had effectively confessed his guilt to his father, this is a proper case for the application of the plain error rule. (134 Ill. 2d R. 615(a).) The plain error rule can be invoked in instances where the evidence is so close that there is a possibility that an innocent man may have been convicted due to an error which is obvious from the record, or the alleged error deprived the accused of a fair and impartial trial. (*People v. Palmer* (1989), 188 Ill. App. 3d 414, 545 N.E.2d 743.) We do not believe that this case is a proper case for the application of the plain error rule. However, as a result of defendant's allegation that the failure to object to these remarks resulted in ineffectiveness of counsel, we address the issue.

A prosecutor is allowed wide latitude in making closing arguments. (*People v. Moman* (1990), 201 Ill. App. 3d 293, 315, 558 N.E.2d 1231.) Absent a clear abuse of discretion, a trial court's rulings on the propriety of these comments will not be disturbed on review. (*People v. Rockman* (1986), 144 Ill. App. 3d 801, 813, 494 N.E.2d 688.) This does not mean prosecutors may misstate facts or argue facts not in evidence. (*People v. Beier* (1963), 29 Ill. 2d 511, 516, 194 N.E.2d 280.) However, even if the prosecutor's remarks were improper, they generally do not constitute reversible error unless they result in substantial prejudice to the accused so as to constitute a material factor in defendant's conviction. (*People v. Baptist* (1979), 76 Ill. 2d 19, 29, 389 N.E.2d 1200.) The prosecutor is allowed substantial latitude in closing argument, and misstatement by a prosecutor does not deprive defendant of a fair trial, unless such remark clearly affected the outcome of the trial. (*People v. Patrick* (1990), 205 Ill. App. 3d 222, 562 N.E.2d 1027.) Improper remarks will not require a reversal of defendant's conviction unless they constitute a material factor in defendant's conviction. *People v. Patterson* (1986), 140 Ill. App. 3d 421, 488 N.E.2d 1283.

Chapman testified regarding his prior conviction for embezzlement from his employer, and defendant acknowledges under *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695, it was proper for the State to rely on this prior conviction to impeach defendant's credibility as a witness. However, in closing argument the prosecutor stated:

> "Who would do such a vile act? I submit the person who would do such a vile act is the same person who steals from his employer.
> Who would do such a vile act to a close friend? Jeffrey Chapman."

While evidence of other crimes is admissible for any purpose, it is inadmissible to prove the defendant's propensity to commit crimes. (*People v. Tiller* (1982), 94 Ill. 2d 303, 316-17, 447 N.E.2d 174.) A

defendant's prior conviction may be considered only as it affects his credibility and not as evidence of his guilt of the crime charged. (*People v. Wilson* (1976), 43 Ill. App. 3d 583, 584, 357 N.E.2d 81.) Defendant maintains that the prosecutor's comments violated these principles and thereby constituted error.

The State points to the statements just prior to the aforementioned quote:

"The defense talked about credibility. Well, we have considered a person's credibility, Ladies and Gentlemen, as you must, from Mr. Chapman consider a person who steals from his employer, a friend. A person who steals from his family, his brother, stealing identification so he can flee.

* * *

Consider, Ladies and Gentlemen, the candor and credibility the truthfulness of Jeffrey Chapman when you consider the testimony in this case on how he will blame a 10 year old cousin, Little Turk, young Joel Hutchinson, Jr. for shooting and killing Linda Veber on the rocks.

* * *

What else do you have to look at, Ladies and Gentlemen, and you know that Antonio Hutchinson did not do it. Who would do such a vile act as to shoot Linda Veber twice in the back? And the bullet wounds, Ladies and Gentlemen, you will see pictures from the medical examiner's office of bullet wounds that are side by side."

The State argues that the prosecutor's argument, when analyzed in the proper context, was justified and was proper argument. The State maintains the prosecutor never suggested or implied that the jury use defendant's prior conviction of embezzlement as evidence of defendant's propensity to commit crimes but, rather, the prosecutor properly and justifiably argued that defendant's credibility and candor were nonexistent.

In *People v. Lawler* (1991), 142 Ill. 2d 548, 563, 568 N.E.2d 895, the prosecutor misstated the law by arguing that because the defendant committed crimes in the past, "the law presumes that he is willing to lie." The Illinois Supreme Court noted that the trial court gave very specific instructions as to how the jury should consider the evidence of the defendant's prior convictions; that it should consider the prior convictions only as evidence of his believability, and not as evidence of his guilt; and that any statement by an attorney that was contrary to the evidence should be disregarded. *Lawler* also noted that the " 'arguments of counsel generally carry less weight with a jury than do instructions from the court.' " *People v. Lawler* (1991), 142 Ill. 2d 548, 564, 568 N.E.2d 895, quoting *Boyde v. California*

(1990), 494 U.S. 370, 384, 108 L. Ed. 2d 316, 331, 110 S. Ct. 1190, 1200.

After closing arguments, and prior to the jury's deliberations, the court stated that the law that applies to the case is stated in the instructions. The court further stated:

"Any evidence that was received for a limited purpose should not be considered by you for any other purpose.

\* \* \*

Opening statements are made by the attorneys to acquaint you with the facts they expect to prove. Closing arguments are made by the attorneys to discuss the facts and circumstances in the case, and should be confined to the evidence and to reasonable inferences to be drawn from the evidence. Neither opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded.

\* \* \*

Evidence of defendant's previous conviction of an offense may be considered by you only insofar as it may affect his believability as a witness, and you must not be considered [sic] by you as evidence of his guilt of the offense which which [sic] he is charged.

The believability of a witness may be challenged by evidence that on some former occasion he made a statement that was not consistent with his testimony in this case. Evidence of this kind may be considered by you only for the purpose of deciding the weight to be given the testimony you heard from the witnesses in this courtroom.

Evidence that a witness has been convicted of an offense may be considered by you only as it may affect the believability of the witness."

■ The trial judge told the jury on numerous occasions that the evidence of prior convictions was to be used solely on the issue of the defendant's credibility and the jury was properly instructed on the law regarding prior convictions. (See Illinois Pattern Jury Instructions, Criminal, Nos. 3.11, 3.12, 3.13 (2d ed. 1989).) The jury was instructed not to consider closing arguments as evidence. A jury is presumed to abide by a court's instruction that closing argument is not evidence and will disregard testimony not admitted into evidence, thereby curing any harm incurred. (*People v. Lasley* (1987), 158 Ill. App. 3d 614, 626, 511 N.E.2d 661.) When read in context, we do not believe that the prosecutor's remarks were improper. However, we also find that if any error occurred, it was cured by the admonishment of the trial judge and the tendered jury instructions. See *People v. Stiff* (1989), 185 Ill. App. 3d 751, 757, 542 N.E.2d 392.

The prosecutor also stated:

"Mr. Shareef told you something very startling about his son's statement to you. Mr. Shareef said, 'When I confronted Jeffrey about what I learned after I talked to Rita Chapman, he just hung his head and turned to the side.'

I submit, Ladies and Gentlemen, that's the boldest statement that he killed Linda Veber as if it came out of his mouth with the words. He can't look his own father in the eye and say no. Just hand [sic] his head and look to the side. That's a statement, and despite whatever he wants to yell and scream about, it came from him. His father told you, and I submit in no uncertain terms that Jeffrey Chapman admitted he did it."

Defendant cites *People v. Beier* (1963), 29 Ill. 2d 511, 517, 194 N.E.2d 280, and *People v. Bitakis* (1972), 8 Ill. App. 3d 103, 106, 289 N.E.2d 256, which hold that assumptions and statements of fact not based on the evidence introduced at trial cannot be argued to the jury.

Alternatively, the State maintains that the prosecutor's argument was proper since it was based on the evidence and was a reasonable inference based on the evidence.

On direct examination, Rashiid Shareef testified:

"Q. And you were asking him questions. Did he respond to your questions?

A. Pretty much not. Jeff and I, as father and son, I have the habit, that I know is bad, of I tend to raise my voice much louder than is necessary. And with regard to Jeff, in doing that, Jeffrey pretty much remained silent all during the time that I'm trying to ask him questions. I'm saying things, he pretty much remained silent.

* * *

A. *** I would like for you to come with me. We'll go to Sheriff Langford's house. You can turn yourself in and that way at least you won't be hurt.

Q. Did he respond to that, sir?

A. He said, 'Dad, no. I don't want to do that.' And again, you know, I asked him again and he said no. And at that time he opened the door to the truck and the bag of clothing that he had was in the back of the truck.

* * *

Q. What happened when you saw the burgandy Camaro this time?

A. When we came even with one another his window was down, my window was down. He looked at me. He said 'Dad, I'm sorry.' And that was the last that he said. And then he drove on out of the apartment complex."

The State asserts that the prosecutor's argument that the defendant hung his head was a reasonable inference based on the testimony of Shareef. The State asserts that it is a reasonable inference that the prosecutor merely argued Shareef's demonstrative testimony on the witness stand and that, although defendant claims that there was no evidence that defendant hung his head, his failure to object at trial and preserve the record suggests the opposite. The State also maintains that the fact that defendant was silent when his father asked him question after question about the murder when an innocent person would have contradicted the allegations is clearly evidence of guilt. See *People v. Cihak* (1988), 169 Ill. App. 3d 606, 617, 523 N.E.2d 975.

■ There is no direct testimony that Chapman hung his head when he was speaking to his father. However, the State makes a forceful argument that the prosecutor was merely referring to Shareef's demonstrative testimony. Since we only have the cold record before us, we cannot determine whether this is true or not. We conclude that the prosecutor's comments were either waived by defendant's failure to timely object, or if improper, in light of the overwhelming evidence of defendant's guilt the above comments did not constitute a material factor in defendant's conviction.

For the reasons set forth above, we hold that the State did not commit reversible error during the closing argument.

## IV

Defendant argues that the trial court erred in excluding evidence of State witness Antonio Hutchinson's prior conviction for unlawful use of a weapon where he denied involvement in the crime but where the defense sought to introduce this evidence to support its theory that Antonio was the shooter. The State maintains that since defendant failed to raise this issue in his post-trial motion, the issue is waived. In addition, the State maintains that the trial court properly precluded the evidence from being admitted since it failed to fall within the parameters of proper impeachment.

Antonio testified that he was not present for the shooting of Linda Veber, whereas Chapman testified that not only was Antonio present, but he was the actual shooter. To support its version of the incident, the defense sought to introduce Antonio's 1989 misdemeanor conviction for unlawful use of a weapon as evidence of Antonio's propensity to commit violent acts. In a pretrial ruling, the trial court excluded this evidence on the ground that the conviction did not tend to prove propensity to commit violence. Defendant argues this ruling was in error and denied defendant his constitutional

rights to due process of law and to present evidence in his own defense.

■ In defendant's motion for a new trial, defense counsel cited as error that: "The Court improperly restricted defendant's efforts to introduce evidence." Defendant argues that since Antonio's conviction was the only evidence which counsel was precluded from introducing, it was apparent that this was what counsel was referring to. We disagree and find that the above statement did not properly preserve this issue for review.

Alternatively, defendant argues that the trial court's denial of defendant's right to present evidence in his defense falls under both the constitutional issue and plain error exceptions to the post-trial motion rule. As is subsequently discussed, we do not find that the trial court erred in its ruling.

Further, defendant argues that the failure of defense counsel to set forth this error with specificity in the post-trial motion should not preclude defendant from advancing the issue on appeal, since it is clear from the record that the trial court would not have reversed its pretrial ruling regardless of the phrasing of the post-trial motion. We find this argument without merit. A review of the judge's remarks indicates that the judge felt that each of the propositions set forth in the motion for new trial was argued earlier. The judge gave his reasons at that time and those reasons were still applicable. We feel that the judge's remarks indicate that he considered the issues raised in the post-trial motion, but that defendant failed to present any new reasons for the judge to change his prior rulings. We find nothing in the record to support defendant's allegations that the trial judge was predisposed to deny defendant's post-trial motion. Additionally, these allegations do not obviate the need to file a written post-trial motion alleging the specific errors.

Finally, defendant argues that any failure to preserve the error in the post-trial motion constituted ineffectiveness of counsel. As is subsequently discussed, we find that the trial court did not err in its ruling. Consequently, we find no merit to defendant's claim of ineffectiveness of counsel on this issue.

During a pretrial motion, the State requested that defendant be precluded from questioning Antonio about his previous misdemeanor conviction of unlawful use of weapons. Antonio's sentence for that conviction was two days' time served, and the prosecutor argued that the conviction was not a crime of moral turpitude, was not a felony and did not come under the ambit of *Montgomery*. (See *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695.) Defendant responded that the misdemeanor conviction was a violation of moral

turpitude. The trial court disagreed. Defendant then argued that the misdemeanor conviction went to Antonio's propensity to commit violent acts. The trial court stated:

"Okay. What would be the purpose, though, you said to show that he is a violent person. The mere fact that a person is arrested carrying a weapon, we don't even know what type of weapon this is. A; at this point in time or any other of the circumstances, he's convicted of carrying a weapon or possessing a weapon. I don't believe that that goes to show any propensity to commit violence."

The trial court ruled that defendant could not question Antonio regarding the prior misdemeanor conviction.

The defendant relies on *People v. Lynch* (1984), 104 Ill. 2d 194, 470 N.E.2d 1018, in support of his position that Antonio's prior misdemeanor conviction was admissible. However, we find the facts of *Lynch* distinguishable from the present case. At issue in the *Lynch* case was the trial court's failure to admit the victim's three prior battery convictions where the defense presented a theory of self-defense. The court held that when the theory of self-defense is raised, the victim's aggressive and violent character is relevant to show who was the aggressor and that the convictions for crimes of violence, such as battery, are reasonably reliable evidence of a violent character. In the present case, Chapman did not present a self-defense theory.

In *Montgomery* the Illinois Supreme Court held that for the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime is admissible only if the crime is a felony or involved dishonesty or false statement regardless of the punishment. (*Montgomery,* 47 Ill. 2d at 516, 268 N.E.2d at 698.) It has been recognized that a misdemeanor conviction for unlawful use of weapons is not admissible under either category. (*People v. Washington* (1984), 127 Ill. App. 3d 365, 384, 468 N.E.2d 1285.) In *Washington* the trial court denied the defendant's motion *in limine* to exclude evidence of his two prior misdemeanor convictions for unlawful use of weapons. The reviewing court held that the impeachment was improper; however, under the facts of that case, the error was not reversible. *Washington,* 127 Ill. App. 3d at 384.

The State cites *People v. Lawler* (1991), 142 Ill. 2d 548, 568 N.E.2d 895, in support of the proposition that other crimes evidence is admissible only if relevant for any purpose other than to demonstrate the propensity to commit crime. The defendant cites *People v. Lindgren* (1980), 79 Ill. 2d 129, 137, 402 N.E.2d 238, to support his position that the reason for this rule is that other crimes evidence "overpersuades the jury, which might convict the defendant only

because it feels he or she is a bad person deserving punishment." The defendant maintains that this danger is not present when the person who committed the other crime is a witness other than the defendant whose guilt or innocence is not before the jury.

■ Although we agree with the defendant that the same concerns are not present when the witness is not the defendant, the decision to admit or preclude a witness' prior conviction rests within the sound discretion of the trial court, and such a ruling will not be reversed absent an abuse of that discretion. (*People v. Montgomery* (1971), 47 Ill. 2d 510, 515, 268 N.E.2d 695.) The decision whether to admit or exclude other crimes evidence must be made on a case-by-case basis by the trial judge responsible for evaluating the probative value of the evidence. (*People v. Illgen* (1992), 145 Ill. 2d 353, 370, 583 N.E.2d 515.) A reviewing court may not simply substitute its judgment for that of the trial court on a matter within the trial court's discretion. *Illgen*, 145 Ill. 2d at 371.

We find that the trial court clearly did not abuse its discretion in excluding evidence of Antonio's prior misdemeanor conviction for unlawful use of a weapon.

## V

A capital sentencing hearing took place on October 4, 1990. The court found defendant eligible for the death penalty because he committed the murder in the course of a felony. In aggravation, the State presented the testimony of Daniel Calkins, a policeman from Muskegon Heights, Michigan, regarding the facts underlying defendant's 1986 conviction for embezzlement. The State also introduced into evidence certified copies of defendant's two prior convictions, for embezzlement and escape. Six witnesses testified on behalf of defendant in mitigation. In addition, Chapman addressed the court prior to sentencing. Although he denied killing Linda Veber, he admitted that he had violated the victim's trust by planning to steal her car. The trial court decided not to impose the death penalty, but sentenced defendant to natural life imprisonment for first degree murder and a concurrent term of 30 years for armed robbery.

Defendant argues that the trial court abused its discretion in sentencing him to natural life imprisonment because his background indicates no prior violent acts and a strong rehabilitative potential. The State maintains that the trial court's sentence was a proper exercise of judicial discretion.

■ The State first argues that the defendant's sentencing allegation is waived by his failure to file a post-sentencing motion

specifically alleging such error. (*People v. Diaz* (1989), 189 Ill. App. 3d 473, 476, 545 N.E.2d 399.) However, assuming *arguendo* that this issue was not waived, we do not find that the trial court abused its discretion in sentencing the defendant to a term of life imprisonment.

A judgment as to the appropriate sentence depends on the facts of each case, considering such relevant factors as the defendant's age, demeanor, mentality, habits, general moral character, credibility, and social environment, along with the nature and circumstances of the offense. (*People v. Saldivar* (1986), 113 Ill. 2d 256, 268, 497 N.E.2d 1138.) In the course of the trial and sentencing hearing, the trial judge has an opportunity to consider the above factors and is in a better position than this court, who may only rely on the cold record. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882.) The imposition of a sentence rests within the sound discretion of the trial court, and absent an abuse of that discretion, a defendant's sentence will not be altered upon review. *Perruquet*, 68 Ill. 2d at 153.

The jury found that the defendant murdered the victim during the course of an armed robbery. Thus, defendant was eligible for a term of life imprisonment. (See Ill. Rev. Stat. 1989, ch. 38, pars. 1005—8—1(a)(1)(b), 9—1(b)(6)(c).) The trial court also noted that the evidence showed that the murder was committed in a cold, calculating and premeditated manner, overwhelmingly showing that it was a preconceived plan, scheme or design to take a human life in order to get this car. As a result, the trial court noted that it could also find the defendant was eligible for a term of life imprisonment as a result of the aggravating factor enunciated in section 9—1(b)(10) of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(10)).

We find that the trial court considered all the appropriate factors, both in aggravation and mitigation. Accordingly, we find no abuse of discretion in the imposition of a life sentence.

## VI

Defendant argues that he was denied his right to an impartial judge at the sentencing hearing where the judge's comments indicated that his personal feelings as the father of two daughters near the age of the murder victim affected his sentencing decision.

The trial judge made the following remarks at the opening of his sentencing decision.

"All right, I've listened to the facts and the circumstances in this case. I have heard everybody testify. I have heard Mr. Chapman testify, and I have consciously tried to divorce myself personally from the facts I heard and from this case so that I, as a professional, would be able to do the job that I had to do. But

under these circumstances, it is extremely difficult to do. And I must consciously try to put myself, not place myself in the position of thinking how Linda Veber's parents must be feeling at this point in time.

I have got two daughters who are a little bit older than Linda was. But in the same vein, Linda Veber appeared to be, from the evidence that I heard here, a vibrant, a live person. And I tried—I have tried consciously not to put myself in the position of their [*sic*] parents because I know what I would be thinking about now. There would be no punishment, no punishment that would satisfy me if it had been one of my daughters who had been killed in the manner in which these facts have shown. But hopefully I can divorce myself from what I think are my natural feelings and go on with this case, try to make these decisions in a professional manner.

I have been able to do that all of my life. I have been able to determine the questions of guilt or innocence, and I think I have been able to do it in an impartial manner. I have been able to impose sentences which I think have been imposed in an impartial manner. So, I hope that my sentence today will not reflect that feeling a father has when we are talking about something that comes right to the heart of my family and every other family. I pray to God that He gives me the strength to do this job in the proper manner."

Where the trial court has considered an improper factor in sentencing, the cause must be remanded unless the reviewing court can conclude that the weight given the improper factor was "so insubstantial that it did not affect the length of the sentence." *People v. Martin* (1988), 119 Ill. 2d 453, 462, 519 N.E.2d 884.

█ After the aforementioned quote, the court continued, stating:

"Looking at the person we have here now, and that's what the Supreme Court says I must focus on, I must focus on Jeffrey Chapman, not on the family, not on the victim, not on anything except the Defendant here."

The court then spoke about defendant's conviction for embezzlement. He noted that in his first criminal act he ran off to Detroit; while he was in prison in Michigan, he fled from prison; and after the commission of this crime, he fled to Georgia. The trial judge indicated that those actions were an attempt to evade the responsibilities for his criminal conduct. The trial judge indicated that Chapman demonstrated many qualities of good to the six teachers that came in from Muskegon, concluding that the appropriate penalty was natural life, without parole.

The trial judge went into great detail about the factors he used to

determine the life sentence. Although the trial judge initially expressed his personal feelings as the father of two daughters of similar age to the victim, the trial judge also stated that he had to divorce himself from those feelings and indicated that the person he had to consider was Chapman. We feel that the trial judge's comments indicated that he recognized that he could not allow his personal feelings to interfere in his sentencing decision. The mere fact that he recognized and expressed the difficult position of determining a sentence for a violent crime did not render him partial. The record reveals that the trial court considered factors both in mitigation and aggravation. We find that the trial judge's comments, when viewed in their entirety, show that the sentencing was based on proper factors and the defendant was afforded an impartial judge at the sentencing hearing.

Accordingly, for all the reasons set forth above, we affirm the conviction and sentences.

Judgment affirmed.

McNULTY, P.J., and GORDON, J., concur.