NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220913-U

NO. 4-22-0913

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 20, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Rock Island County |
| PATRICK NOYA, | ) | No. 19CF987 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Norma Kauzlarich, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justice Steigmann concurred in the judgment.
Justice Doherty specially concurred.

**ORDER**

¶ 1    *Held*: (1) After replacing a juror during deliberations, the circuit court failed to instruct the reconstituted jury to begin the deliberations anew, thereby committing plain error in this case in which the evidence was closely balanced.

(2) Because the evidence is sufficient to sustain the convictions, there is no double-jeopardy impediment to a new trial.

¶ 2    In the circuit court of Rock Island County, a jury found defendant, Patrick Noya, guilty of two counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(f) (West 2018)), one count of unlawful restraint (*id.* § 10-3(a)), and one count of distributing harmful material to a minor (*id.* § 11-21(g)). The court sentenced him to probation for 36 months and 90 days in jail. Defendant appeals on two grounds.

¶ 3        First, he claims that defense counsel rendered ineffective assistance by (a) failing to object to evidence of uncharged bad acts and (b) acquiescing to a jury instruction that such evidence could be considered on the issue of intent.

¶ 4        Second, during deliberations, the circuit court replaced a juror without first following what defendant regards as essential procedural safeguards. The remaining jurors were never asked if they had been exposed to outside influence or if they had already formed opinions. Also, the court never instructed the reconstituted jury to begin the deliberations anew. Defendant acknowledges that because he never raised these contentions of error below, they are unpreserved. Nevertheless, he invokes the doctrine of plain error. Alternatively, he claims that defense counsel rendered ineffective assistance by failing to make these inquiries of the remaining jurors.

¶ 5        We do not reach the claims of ineffective assistance. Instead, in this case in which the evidence was closely balanced, we find plain error in the circuit court's failure to instruct the reconstituted jury to begin the deliberations anew. Therefore, we reverse the judgment, and we remand this case for a new trial.

¶ 6                              I. BACKGROUND

¶ 7        The complainant was U.A., a 17-year-old girl. In the jury trial, she testified substantially as follows. Defendant was one of her teachers in high school, and he rubbed her back almost every day during class. On November 5, 2018, she came to defendant's classroom and asked defendant to help her with some homework. No one else was present. He touched her and requested permission to kiss her. She said no. He said he would help her if she helped him. She asked him to issue her a pass so she could return to her classroom. He refused to do so. So, she sat down at a desk in his classroom and listened to music. As she was sitting there, he started rubbing the side of her hip, telling her he wanted to kiss her. While standing beside her, he showed her a

video on his phone of people having sex. As he played the video for her, he touched the side of her hip with his erect, clothed penis, telling her he wanted to sleep with her. U.A. warned him to stop or else she would tell his wife. U.A. was wearing a sweater over another top. Because she was hot, she took off the sweater. Defendant then touched her chest over her clothes. Again she threatened to tell his wife. At some point, two boys knocked on the door of the classroom.

¶ 8    One of the boys, C.L., testified that on November 5, 2018, he and a friend tried to meet with defendant in a classroom to speak with defendant about a school project. The door to the classroom was locked. Through a window, C.L. saw that a girl was in the dimly lit classroom. The lights of the classroom were turned off so that the classroom was illuminated only by daylight from outside. Defendant came to the door, opened it, and said to come back later because he was busy.

¶ 9    Defendant testified in his own behalf, denying he ever touched U.A. or ever kept her in his classroom against her will. He recounted that on November 5, 2018, U.A. came to his classroom during his planning period and requested to take a test that she refused to take a few days prior. He would not allow her to take the test. She told him she would not leave until he gave her the test. He replied that he was going to the restroom and that, by the time he returned, he wanted her gone. When he returned, she was still in the classroom. He let her sit in the classroom while, with the lights dimmed, he set up a projector for his next class. This was not the first time the two of them had a disagreement. He recalled that, in about mid-October 2018, U.A. came to class wearing "very, very, very short pants" and a shirt "only covering the top part." He scolded her that "coming to class with this attire [was] not acceptable." She "snapped," cursing at him and telling him, " ['L]eave my life alone,['] " " ['D]on't do anything to me,['] " and " [']I will make sure you don't finish a year in this school.['] "

¶ 10        In addition, the State called three other young women, J.N., F.L., and T.S., who were not complainants. All three had attended the same high school as U.A. Like U.A., they were immigrants from Africa. They testified to being subjected to sexual behavior by defendant while they attended the high school. At the prosecutor's request, the circuit court instructed the jury that evidence of acts other than those alleged in the indictment could be considered only for the purpose of assessing intent.

¶ 11        J.N. testified that, while attending high school, she discussed her personal life with defendant, including "sexual stuff." One day, while giving her a ride home, defendant reached over as they were talking, and he rubbed her thigh (according to her testimony). This touching made her uncomfortable. He asked her if she wanted to go to the movies and to go shopping. She declined. She asked him for advice on how to get over a boy. Defendant advised her to go into her bedroom, take off her clothes, listen to music, and then touch herself, particularly her breasts. Sometime before mid-November 2018, J.N. stopped by defendant's classroom—she could not remember why. On that occasion, he showed her a book "that had bad stuff in it," a depiction of people engaging in sexual acts. No one else was in the classroom at the time.

¶ 12        F.L. testified that when she was a high-school student, defendant discussed his family with her. He told her he had four girls but that he wanted a boy. He repeatedly told F.L. that he wanted to have a secret relationship with her—that he wanted to have sex with her so that she would bear him a son. One day, as she was shelving a book, he approached her from behind and put his hand on her hip. Also, he offered her a ring "to disclose his love" to her.

¶ 13        T.S. testified that on many occasions in 2017, while she was in the classroom with other students, defendant massaged her shoulders. She disliked this touching. Once, at his request, she stopped by his classroom after school, and he tried to give her some "sexy underwear." She

refused the underwear. On another occasion, when she was the last student to leave the classroom, defendant stood by the door and asked her for a kiss. At that moment, however, another teacher was approaching down the hall. Defendant moved away from the door, and T.S. left.

¶ 14 On the other hand, defendant denied touching any of the witnesses. He denied talking with them about sex, offering them gifts, or showing pornographic images to them. In short, he denied all the allegations of misconduct.

¶ 15 Jury deliberations began at 9:45 a.m. on June 19, 2022. During the deliberations, a police officer informed the prosecution that he recognized one of the jurors, Juror Wilkins, as a convicted sex offender. Because the prospective jurors had been asked if they had any felony convictions and because Wilkins had disclosed none, the circuit court halted the deliberations. (According to a statement that defense counsel made later, in the posttrial-motion hearing, deliberations had proceeded for about 30 minutes before the court halted the deliberations.) With the parties' agreement, the court called Wilkins into the courtroom and questioned him under oath. Wilkins explained that he had been too embarrassed to disclose the felony conviction. The court asked the attorneys if they wanted to question Wilkins. They declined to do so. The court dismissed Wilkins from the jury for cause and proposed that the names of the alternate jurors be written on slips of paper and that defendant draw a name out of a cup. The attorneys agreed to this proposed procedure. Defendant drew Juror Curry's name.

¶ 16 The circuit court asked the attorneys, "[D]o you wish for me to make a record of Mr. Curry and inquire as to whether he has spoken to anybody about the case or discussed it?" They both answered yes. When Curry arrived in the courtroom, the court asked him:

"THE COURT: Mr. Curry, you have been a juror in this matter for the entire week; is that correct?

JUROR CURRY: Yes.

THE COURT: And you learned earlier today that you were—this morning that you were one of the alternate jurors; is that correct?

JUROR CURRY: Yes.

THE COURT: And I—I had you leave and give phone numbers to my bailiffs; correct?

JUROR CURRY: That is correct.

THE COURT: And during the time between the time you left and the time you—I had Ms. Nancy call you back, have you spoken to anybody about this case?

JUROR CURRY: No.

THE COURT: Have you discussed any of the points or issues presented in this case in front of you during the presentation of the evidence, have you emailed anybody about it, have you researched anything?

JUROR CURRY: Absolutely not.

THE COURT: Have you gone to the place of the alleged occurrence?

JUROR CURRY: No.

THE COURT: Okay. [Prosecutor] Gardner.

MS. GARDNER: No questions.

THE COURT: [Defense Counsel] Walker?

MR. WALKER: No, ma'am, no questions.

THE COURT: So Mr. Curry, you are now part of the deliberating jury pool, so if you would go with Ms. Nancy, and she'll take you back to the jury room. I think they were asking for pop orders or something for some pizza and that stuff.

JUROR CURRY: Okay."

¶ 17	Deliberations resumed at 11:15 a.m. The reconstituted jury reached its verdicts at 1:44 p.m.

¶ 18	II. ANALYSIS

¶ 19	Defendant claims that the circuit court abused its discretion by replacing Juror Wilkins with Juror Curry. Defendant acknowledges that, before putting Curry on the jury, the court asked Curry whether he had communicated with anyone about the case and whether he had done any research and that Curry answered no to those questions. Even so, defendant argues that, in three ways, the court failed to comply with *People v. Roberts*, 214 Ill. 2d 106, 124 (2005): (1) the court never asked "the remaining original jurors" whether they "were exposed to outside prejudicial influences about the case" (we quote from *Roberts*), (2) the court never asked the original jurors if they "had formed opinions about the case in the absence of the alternate juror," and (3) the court never "instructed" the reconstituted jury "to begin deliberations anew."

¶ 20	To preserve a claim of error for appellate review, a defendant must make a contemporaneous objection and must raise the error in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186-87 (1988). When the replacement of Juror Wilkins with Juror Curry was proposed, defendant made none of the three objections that he makes now. Consequently, these objections are unpreserved. Defendant admits that "[b]ecause the postsubmission replacement issue was not properly preserved, it must be reviewed for plain error."

¶ 21	The supreme court has held that, in two circumstances, the plain-error doctrine allows the review of what would otherwise have been a forfeited claim of error:

"(1) where a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant,

regardless of the seriousness of the error[,] and (2) where a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Stewart*, 2022 IL 126116, ¶ 11.

Defendant claims that both of those circumstances exist in his case. He contends that because his trial was a credibility contest between U.A. and himself, the evidence was closely balanced. Also, he argues that noncompliance with *Roberts* affected the fairness of his trial and challenged the integrity of the judicial process.

¶ 22 Regardless of which theory of plain error is invoked, the first step in a plain-error analysis is to identify an error that is clear or obvious, as opposed to an error that is merely arguable. See *id.*; *People v. Stevenson*, 2020 IL App (4th) 180143, ¶ 14. Defendant claims that by failing to do the three things listed in paragraph 19 above, the circuit court fell afoul of *Roberts*. Therefore, we will scrutinize *Roberts* to see what procedures, if any, it clearly requires for the postsubmission replacement of a juror.

¶ 23 We begin with the facts in *Roberts*. During deliberations in that case, the jury sent out a note informing the circuit court that, before testifying, a defense witness spoke with one of the jurors outside the courtroom and that, because of the conversation, the juror possibly felt intimidated. *Roberts*, 214 Ill. 2d at 111. The court questioned the juror, who said that, because of this out-of-court encounter with the witness, she did not think she could be fair and impartial. *Id.* at 112. In her dialogue with the court, the juror divulged that "[t]he jury voted twice after they went into the jury room" and that she "voted 'not guilty' both times." *Id.* The court also questioned the remaining 11 jurors. *Id.* at 113. They assured the court that the reported conversation between

the juror and the witness would not influence them and would not affect their ability to be fair and impartial. *Id.* The court dismissed the influenced juror from the jury, denied defense counsel's motion for a mistrial (*id.*), and recalled the alternate juror (*id.* at 114). In response to questioning by the court, the alternate juror said she had not discussed the facts of the case with anyone and that she had formed no opinion about the case. *Id.* The court instructed the other 11 jurors to begin deliberations anew. *Id.* The reconstituted jury found the defendant guilty. *Id.*

¶ 24    On appeal, the defendant in *Roberts* contended that replacing the juror after, as opposed to before, submitting the case to the jury violated section 115-4(g) of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-4(g) (West 2000)) and Illinois Supreme Court Rule 434(e) (eff. May 1, 1985). *Roberts*, 214 Ill. 2d at 114. In neither of those authorities, however, did the supreme court find any "express language *** barring replacement of a juror after submission." *Id.* at 116. The supreme court concluded that, "[i]n the absence of a specific prohibition of postsubmission juror replacement," such a replacement "should be viewed as a matter within the discretion of the trial court." *Id.* at 121.

¶ 25    "In determining whether the trial court abused its discretion," the supreme court explained, "the primary consideration must be the potential prejudice to the defendant as a result of the postsubmission replacement." *Id.* Replacing a juror during deliberations created a "substantial potential for prejudice." *Id.* at 124. Thus, trial courts had to "review carefully the matter and take significant precautions to avoid prejudice before allowing [such a] substitution." *Id.* In determining whether the defendant suffered prejudice from such a substitution, the reviewing court was to "consider the totality of the circumstances, including" the following:

> "(1) whether the alternate juror and the remaining original jurors were exposed to outside prejudicial influences about the case; (2) whether the original jurors had

formed opinions about the case in the absence of the alternate juror; (3) whether the reconstituted jury was instructed to begin deliberations anew; (4) whether there is any indication that the jury failed to follow the court's instructions; and (5) the length of deliberations both before and after the substitution." *Id.*

The supreme court cautioned, however, that "the privacy and secrecy of a jury's deliberations" should not be violated and that "trial courts must be careful to avoid inquiring as to jurors' specific views on the case." *Id.*

¶ 26   For three reasons, the supreme court found that the defendant in *Roberts* had been prejudiced by the postsubmission replacement. First, although the alternate juror apparently knew of the contact between the excused juror and the witness, the alternate juror was never questioned about this knowledge. *Id.* Thus, the circuit court neglected to "ensure that the alternate juror was not biased due to outside influence." *Id.*

¶ 27   Second, the jury had delayed informing the circuit court of the contact between one of its members and the witness—even though the court had instructed the jurors "that they were prohibited from speaking to witnesses" and that "they should inform one of the deputies if they had personal problems or were in doubt as to their duties as jurors." *Id.* at 125. The supreme court remarked, "[T]he failure of the jurors to notify promptly the court of this contact may be viewed as a lack of appreciation for their duties." *Id.*

¶ 28   Third, at the time of the replacement, the original jurors already had voted. In fact, the supreme court noted:

> "The record shows the 11 original jurors voted twice before the case was submitted to the reconstituted jury. Thus, these 11 jurors formed and declared their opinions about this case before the reconstituted jury deliberated. The environment of the

reconstituted jury would be inherently coercive for the alternate juror because the other jurors had already determined their views on the case." *Id.*

¶ 29    "[On the basis of] these circumstances," the supreme court in *Roberts* "agree[d] with the appellate court that [the] defendant was prejudiced by the replacement of the excused juror with the alternate juror after submission." *Id.* at 126.

¶ 30    The difficulty with using *Roberts* to argue that the circuit court should have taken certain precautionary measures is that the prejudice-measuring factors are addressed to the reviewing court instead of to circuit courts. The five-point passage from *Roberts*, which we quote in paragraph 25, above, is not phrased as a to-do list for the circuit court. The passage does not explicitly mandate that the circuit court give certain admonitions and make certain inquiries. Instead, the passage is phrased as a list of factors a reviewing court will consider in deciding whether a defendant suffered prejudice from the "substitution of an alternate juror during deliberations." *Id.* at 123-24. Just because the reviewing court should consider, for example, "whether the alternate juror and the remaining original jurors were exposed to outside prejudicial influences about the case" and "whether the original jurors had formed opinions about the case in the absence of the alternate juror," it does not *clearly* follow that, in every case of a postsubmission replacement, the circuit court must make inquiries that would negate those theoretical possibilities. *Id.* at 124. If the record lacks any evidence of prejudicial influences or preformed opinions, the reviewing court would have no basis for finding those prejudicial factors.

¶ 31    One of the items listed in *Roberts* is different, however, in that it *is* phrased as a task by the circuit court: "whether the reconstituted jury was instructed to begin deliberations anew." *Id.* Because the five-factor passage in *Roberts* is prefaced by the statement that trial courts must "take significant precautions to avoid prejudice before allowing substitution," *Roberts* can

only be understood as requiring such a precautionary instruction. *Id.* The clear implication in *Roberts* is that after replacing a juror during deliberations, the circuit court must instruct the reconstituted jury to begin the deliberations anew. See *id.*

¶ 32            This implication gains strength from the supreme court's citation of *United States v. Quiroz-Cortez*, 960 F.2d 418, 420-21 (5th Cir. 1992). See *Roberts*, 214 Ill. 2d at 124. At the pages cited in *Roberts*, the Fifth Circuit explains:

> "An alternate juror replacing a regular juror after the jury has commenced its deliberations may be unable to participate equally with the other jurors, because he will lack the benefit of the prior deliberations. There is a danger that the other jurors will have already formulated positions or viewpoints or opinions in the absence of the alternate juror and then pressure the newcomer into passively ratifying this predetermined verdict, thus denying the defendant the right to consideration of the case by twelve jurors." (Internal quotation marks omitted.) *Quiroz-Cortez*, 960 F.2d at 420.

The district court in *Quiroz-Cortez* "substituted only after repeatedly and explicitly instructing the jury to 'start all over again with regards to your deliberations' because the alternate juror 'need[s] to have benefit of everything you've conducted so far.' " *Id.* In part because of that jury instruction, the reviewing court in *Quiroz-Cortez* found "little risk of prejudice from the late substitution." *Id.*

¶ 33            The plain import of *Roberts* is that instructing the reconstituted jury to begin its deliberations anew is one of the "significant precautions" that a circuit court must take when replacing a juror during deliberations. *Roberts*, 214 Ill. 2d at 124. By virtue of such an instruction, the substituted juror can have the full benefit of the preceding discussion with less risk of being

pressured by any predeterminations. In the present case, the circuit court clearly erred by failing to instruct the reconstituted jury to begin the deliberations anew.

¶ 34     Having identified a clear or obvious error in this respect, we proceed to the next question posed by the first prong of the plain-error doctrine: whether the evidence was closely balanced. See *Stewart*, 2022 IL 126116, ¶ 11. Case law holds that if the victim and the defendant both gave plausible accounts, and if "no extrinsic evidence was presented to corroborate or contradict either version," the trial was a "contest of credibility" in which the evidence was closely balanced. (Internal quotation marks omitted.) *People v. Sebby*, 2017 IL 119445, ¶ 63. Although U.A. and defendant agreed that they were alone together in defendant's classroom on November 5, 2018, their differing accounts of what happened in the classroom were uncorroborated and were uncontradicted by extrinsic evidence. Neither account was inherently implausible. Whether defendant engaged in sexual conduct toward U.A. was entirely a question of who should be believed: U.A. or defendant. Granted, other witnesses testified to being sexually abused or harassed by defendant. Under the limiting jury instruction, however, the testimony of these other witnesses was admissible only to determine whether defendant had the requisite intent to touch U.A. for his own sexual gratification (see 720 ILCS 5/11-1.60(f) (West 2018); *id.* § 11.01 (definition of "sexual conduct"))—*if* the jury believed U.A.'s testimony, in the first place, that defendant touched her. Because the trial was a contest of credibility between U.A. and defendant, we conclude that the evidence was closely balanced. See *Sebby*, 2017 IL 119445, ¶ 63.

¶ 35     So, in a case in which the evidence was closely balanced, the circuit court failed to instruct the reconstituted jury to begin the deliberations anew. We must determine whether this error was "of such a nature that it might have tipped the scales against the defendant." (Emphasis omitted.) *People v. Ely*, 2018 IL App (4th) 150906, ¶ 18. *Quiroz-Cortez*—a case on which *Roberts*

relied—calls for an affirmative answer to that question. "There is a danger that the other jurors will have already formulated positions or viewpoints or opinions in the absence of the alternate juror and then pressure the newcomer into passively ratifying this predetermined verdict, thus denying the defendant the right to consideration of the case by twelve jurors." (Internal quotation marks omitted.) *Quiroz-Cortez*, 960 F.2d at 420.

¶ 36　　　　To be sure, under the facts of this case, the prejudice factors from *Roberts* do not all point in the same direction. The record does not show that "the alternate juror and the remaining original jurors were exposed to outside prejudicial influences about the case" or that "the original jurors had formed opinions about the case in the absence of the alternate juror." *Roberts*, 214 Ill. 2d at 124. By questioning Curry, the circuit court made sure he had not been subjected to any outside influence. See *id.* Also, the reconstituted jury deliberated considerably longer after the replacement than before the replacement. See *id.* Even so, "[w]here guilt or innocence depends entirely on the credibility of an accuser and the defendant, no error should be permitted to intervene." *People v. Emerson*, 97 Ill. 2d 487, 502 (1983). "Where error is shown to exist, it will compel reversal, unless the record affirmatively shows that the error was not prejudicial." (Internal quotation marks omitted.) *Id.* The record does not affirmatively dispel the possibility that, during the half-hour of deliberations preceding the replacement of Juror Wilkins with Juror Curry, some or all of the remaining 11 jurors formed an opinion on a factual issue in the case. Nor does the record affirmatively dispel the possibility that Curry was deprived of the benefit of issue-related discussions that preceded his placement on the jury. Therefore, in this closely balanced case, the circuit court's failure to instruct the reconstituted jury to begin the deliberations anew warrants reversal on the ground of plain error. See *id.*

¶ 37        Unlike *Roberts*, with its multifactorial analysis calculated to assess actual prejudice, the present appeal invokes the plain-error doctrine. All that a plain-error analysis requires is that we identify a clear or obvious error from which the possibility of prejudice flows. See *Stewart*, 2022 IL 126116, ¶ 11; *Ely*, 2018 IL App (4th) 150906, ¶ 18. We should decide no more than what we have to decide. See *People ex rel. Sklodowski v. Illinois*, 162 Ill. 2d 117, 130 (1994). The omission of the instruction to begin deliberations anew is, in and of itself, a clear or obvious error from which the possibility of prejudice flows.

¶ 38        Notwithstanding this plain error, we find, from our review of the record, that the evidence was sufficient to prove defendant guilty of the charged offenses beyond a reasonable doubt. Therefore, we conclude that there is no double-jeopardy impediment to a new trial. See *Roberts*, 214 Ill. 2d at 126. We express no conclusion as to defendant's guilt that would be binding on retrial.

¶ 39                                III. CONCLUSION

¶ 40        For the foregoing reasons, we reverse the circuit court's judgment, and we remand this case for a new trial.

¶ 41        Reversed and remanded.

¶ 42        JUSTICE DOHERTY, specially concurring:

¶ 43        The result reached by the majority is, I believe, correct, but I do not agree with the manner in which the majority chooses not to apply the "totality of the circumstances" analysis called for in *Roberts* in reaching that result.

¶ 44        I agree that the issue of juror substitution must be addressed here under a plain error analysis, as defendant did not properly preserve the issue. Illinois reviewing courts typically undertake a plain error analysis by first determining whether error occurred at all. *People v.*

*Sargent*, 239 Ill. 2d 166, 189 (2010). That inquiry is guided by *Roberts*, which found that applicable Illinois statutes do not explicitly prohibit the use of alternate jurors after the case is submitted to the jury, making the matter one within the trial court's discretion. *Roberts*, 214 Ill. 2d at 120-21. "In determining whether the trial court abused its discretion, the primary consideration must be the potential prejudice to the defendant as a result of the postsubmission replacement." *Id.* at 121.

¶ 45 In examining the potential for prejudice, the supreme court held that the "totality of the circumstances" must be considered, including the following five factors: "(1) whether the alternate juror and the remaining original jurors were exposed to outside prejudicial influences about the case; (2) whether the original jurors had formed opinions about the case in the absence of the alternate juror; (3) whether the reconstituted jury was instructed to begin deliberations anew; (4) whether there is any indication that the jury failed to follow the court's instructions; and (5) the length of deliberations both before and after the substitution." *Id.* at 124.

¶ 46 Here, I agree that in considering the totality of the circumstances, the trial court abused its discretion by failing to adequately guard against prejudice to defendant as a result of the switching of jurors. First, there was an inadequate examination of the original jurors and about possible outside influences. In this circumstance, any such "outside influence" could only have come from the juror dismissed because of his undisclosed prior sex offense. We are left to wonder what, if any, statements were made about the case by the dismissed juror and what effect it had on the jury's initial deliberations. Similarly, we do not know whether the original 11 jurors had formed any opinions about the case. Finally, and as correctly noted by the majority, the jury was not instructed to begin its deliberations anew, which could create a coercive environment for the newly added alternate juror.

¶ 47        I agree with the majority's conclusion that the evidence here was closely balanced and that this fact, combined with the error discussed above, satisfies the "closely balanced prong" of plain error review. See *People v. Adams*, 2012 IL 111168, ¶¶ 21, 23.

¶ 48        My disagreement with the majority is simply that it reached this conclusion by examining only one factor laid out in *Roberts*, as opposed to the prescribed "totality of the circumstances" analysis. The fact that the supreme court in *Roberts* cited the opinion of the Fifth Circuit Court of Appeals in *United States v. Quiroz-Cortez*, 960 F.2d 418 (5th Cir. 1992), does not, in my view, provide a basis for deriving from *Roberts* some different analysis. The supreme court certainly considered and relied on *Quiroz-Cortez* in reaching its holding in *Roberts*, but that holding specifies a "totality of the circumstances" approach rather than giving one factor determinative effect. Even though the giving of an instruction to restart deliberations was important to the court's decision in *Quiroz-Cortez*, this constituted a case-specific determination rather than a broad statement that the reverse—the failure to give the instruction—is always error. Certainly *Roberts* gives no hint of adopting such a *per se* rule.

¶ 49        Although I do not believe that the failure to instruct the jury to restart deliberations in cases where a juror is replaced is automatically error or a basis for reversal, I do agree with the majority that giving the instruction is wise and highly advisable.